# CASES DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS

MANZIL *v.* WHITE.

Opinion delivered October 29, 1923.

1. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING OF FACTS.—In chancery causes the findings of fact of the chancellor are allowed to stand, upon appeal, unless they are clearly against the preponderance of the evidence.

2. FRAUD—MATERIALITY OF REPRESENTATION.—In order to vitiate a contract on the ground of fraudulent misrepresentation, the misrepresentation must relate to a matter material to the contract and in regard to which the other party had a right to rely, and did rely, to his injury; and, where the means of information as to the matters misrepresented is equally accessible to both parties, they will be presumed to have informed themselves, and, if they have not done so, must abide the consequences of their own carelessness.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; affirmed.

*Cravens & Cravens* and *Holland & Holland,* for appellant.

To constitute fraud, the facts misrepresented or concealed must have been material, and substantially affect the interest of the person alleged to have been deceived. 12 R. C. L., p. 297, § 61; 30 Ark. 362; 8 Ark. 146; 95 Ark. 131. A plaintiff must also show that not only was he misled and damaged by the false representation, but also show that the defendant knew that the representation was false, or, being ignorant as to whether false or true, asserted it was true, and did so with intent to deceive. 71 Ark. 305. The fraud must have resulted in injury before an action would lie. 11 Ark. 378; 57 Ark. 441; 20 Cyc. p. 43. A purchaser must make use of

his means of knowledge, and, failing to do so, cannot recover on the ground that he was misled by the vendor. 20 Cyc. 50; see also 7 Ark. 167; 43 Ark. 462; 19 Ark. 522; 31 Ark. 170. If the beneficial enjoyment of his contract be not materially taken away, and there is only a failure of consideration which can be compensated in damages, there is no ground for rescission. 46 Ark. 337. The articles removed were of slight value. The representation must be material; must relate to some matter substantial and important. 20 Cyc. 23; 20 Cyc. 124 (b); 30 Ark. 362. The testimony is not sufficient. Fraud is not presumed, and the burden of proving it rests upon him who asserts it. 108 Ark. 415; 45 Ark. 492; 20 Cyc. 108-9; 16 Cyc. 930; 144 Ark. 97. See also 20 Cyc. 120; 23 Ark. 176; 11 Ark. 378; 82 Ark. 20.

*Webb Covington,* for appellee.

A vendor guilty of falsehood, made with intent to deceive, should not be heard to say that the purchaser ought not to have believed him. 128 U. S. 383; 9 Sup. Ct. Rep. 101, 32 L. ed. 439; 97 Fed. 854; 54 Fed. 320; 74 Ark. 46.

WOOD, J. This action was instituted by the appellee against the appellants to restrain appellants from disposing of certain notes executed by the appellee to the appellants as purchase money for certain personal property which the appellee had agreed to purchase of appellants, and also to recover the sum of $575, which he alleges the appellants had realized on a check given to them by the appellee, and the further sum of $200 damages. The appellee, among other things, alleged that she purchased of the appellants all furnishings in a certain rooming-house in Fort Smith, and agreed to pay the appellants the sum of $1,100; that, prior to said purchase, the appellants represented to the appellee that twelve rooms in the rooming-house in which the furnishings were then located were occupied by roomers, and that the rooms paid the sum of $150 per month, exclusive of any and all expenses to be incurred in the conduct of the rooming-house. Appellants represented

that they were the owners of the furnishings in the rooms, and that there were no claims against them whatever. The appellee alleged that she relied upon the representations made to her with reference to the earnings of the rooming house and as to the ownership of the property mentioned, and by reason of such representations she gave her check to the appellant in the sum of $575 and executed ten notes of $50 each, payable monthly thereafter; that soon after the execution and delivery of the notes and check she ascertained that the appellants were not the owners of a large portion of the furnishings in the rooms in the building mentioned, and that the rooms had not paid, and were not then paying, the sum of $150 per month, all of which facts were well known to the appellants at the time they made such representations; that such representations were false and fraudulent and made for the false and fraudulent purpose of inducing the appellee to execute the notes and checks, and that she relied upon such representations in doing so; that the appellants had cashed the checks and unless restrained would dispose of the notes. She prayed for a restraining order preventing the appellants from disposing of the notes and for a decree in the sum of $575 for her damages growing out of such false representations.

The appellants answered, denying specifically the allegations of the complaint as to the fraudulent misrepresentations, and they averred, by way of cross-complaint, that the appellants showed the appellee their rooming-house and advised the appellee that the appellants and their family occupied seven of the twelve rooms in said house as their home, and they told appellee that, if she could rent all of the rooms, including those occupied by the appellants, she could get therefor approximately the sum of $150 per month. Appellants, at the same time, pointed out the furnishings in the rooming-house which did not belong to them, which included certain small articles, and told the appellee that these were not included in the sale, and, with the exception of these articles so pointed out, the appellants

informed the appellee that the furnishings in the house belonged to appellants, and that there were no liens or incumbrances against any of the property. Thereupon the appellants and the appellee closed a deal for the furnishings which appellants pointed out to the appellee as their property; that the appellee thereupon gave to appellants her check in the sum of $575 and executed her promissory notes as alleged in the complaint. They further set up that the appellee had thoroughly inspected the property before purchasing same and fully understood what she was purchasing. They averred that appellee had not paid one of the notes at the time the same became due, and that, under the terms of the contract, such failure to pay rendered all of the series of notes due and payable. Appellants therefore prayed that the appellee's complaint be dismissed for want of equity, and, by way of cross-complaint, that they have judgment against appellee for the sum of $500 with interest, balance due of the purchase money as represented by the promissory notes, and also for the sum of $25 represented by check which the appellee had given to appellants as earnest money and on which she had stopped payment at the bank.

Appellee testified that she purchased certain personal property under a bill of sale, which she identified and introduced in evidence. The bill of sale recited that, for the consideration of $1,100, the appellants sold to the appellee "the following property, goods, and chattels, to-wit, all the furnishings used in the conduct of a certain rooming-house located at 412½ Garrison Avenue, Fort Smith, Arkansas." It was recited in the writing that $600 had been paid in cash, and ten notes in the sum of $50 each, due monthly thereafter, had been executed. The writing further recited that Mary Manzil was "the true and lawful owner of the property, goods and chattels hereby sold, and has full power to sell and convey the same. The title so conveyed is clear, free and unin-

cumbered, and that she will warrant and defend the same
against the claims of all persons whomsoever."

The testimony of the appellee was substantially as
follows: She examined the house and furniture before
purchasing the furniture, in company with Mrs. Manzil,
who showed appellee the property, and told her that
everything in there was to be hers for the sum of $1,100,
except trunks and a graphophone which belonged to peo-
ple there. They went through the rooms, and Mrs. Manzel
showed appellee everything in the rooms. There were
six rooms on one side and six on the other. Appellee
wanted to know what the income of the house was, and
Mrs. Manzil stated they were getting $150 a month for
the place. Those were her exact words. Appellee relied
upon these representations, and made the purchase.
Appellee paid $575 for the house, and, in addition thereto,
executed her notes as set forth in the complaint. The
whole consideration amounted to $1,100. After she had
purchased and executed the notes and given Mrs. Manzil
her check, she returned to the house about 7 p. m. to
take possession of it. She received information that
appellant did not own all the things that she represented
as being hers. Therefore she did not take possession
of the house, and endeavored at once to notify the
cashier of the bank not to cash the check she had given,
but did not succeed that night, and the next morning
she tried to stop payment on the check, and the bank
officials promised not to pay the check. She saw Mr.
Manzil, and asked him what he was going to do about
the check, and he informed the appellee that he was not
going to do anything about it; that he had already taken
it to the bank and paid it in on a note that he was due
the bank. She told Manzil that certain ladies had in-
formed her that certain property, which Mrs. Manzil had
represented as hers, belonged to them, linen, silverware,
bedclothing, furniture, rugs, dishes and necessary cook-
ing utensils and things that, according to witness' under-
standing, belonged to the house. Mrs. Manzil told wit-
ness about these things that belonged to them; that

everything belonged to her except the trunks and the Edison graphophone. Witness was buying the furnishings for the rooming-house and was going to take a lease thereon. There were two families in the house on the light-housekeeping side, and one roomer and no other boarders in the rooms. Appellants represented to witness that they were getting $25 a month on the light-housekeeping side for the rooms, two rooms for each apartment, and that for the other rooms they were getting $15 per month. They told appellee that the rent would come to ninety some odd dollars for the light-housekeeping side of the house and $150 for the whole house. Mrs. Manzil further informed the appellee that she was paying $75 per month for the rent of the entire house. Appellants told appellee that she could make arrangements with the party who owned the house to lease it by the month, and appellee was going to lease it as soon as she took possession.

On cross-examination, the appellee, among other things, testified that she found everything in the kitchen as Mrs. Manzil had represented it. She stated that when she returned to take possession that night, in the last two rooms the people had moved out, and it was the emptiest place she ever saw. She didn't know what the property was worth that the people claimed belonged to them. The rugs, carpets, mattresses and springs and things like that were intact. Further along in her testimony she stated that the woman who had moved out, when she returned to take possession, had moved linen, cooking utensils, dishes and things like that, but she didn't know what they were.

After this litigation arose A. J. Berry was appointed receiver of the property. He made an inventory of the property. The rent of the rooming-house per month was $65. He identified the inventory of the furnishings of the house which he took over that was embraced in the bill of sale.

A. S. Bullock testified that he was the cashier of the First National Bank, and that, as such cashier, he

cashed the check drawn by the appellee in favor of Manzil for $575 some time in May. He cashed the check at 7:18 in the morning—met Manzil coming toward the bank, and went with him to the bank and gave him credit for the amount of the check on his account. Manzil at the time showed the cashier the notes and the contract that he had with the appellee.

Witness Bourland testified, on behalf of the appellants, that he was a real estate agent, and went with the appellee to show her the rooming-house occupied by the appellants with a view of making a deal between the appellee and the appellants for the furnishings. Appellee gave witness her check for $25 to pay to Manzil as earnest money. Among other things witness testified that, when witness and the appellee went to look at the house, Mrs. Manzil told appellee that if she rented all the rooms the place would bring around $150 per month. Everything was shown them as they went through the house. There were a couple of boxes in one of the front rooms which Mrs. Manzil said she would move out. Then she spoke about a victrola in one room that belonged to roomers. She pointed out some dishes, pans, and stuff like that belonged to roomers. All of the furniture belonged to Mrs. Manzil. Mrs. Manzil said something about keeping her own silverware that she had been using herself.

Mrs. Garcia testified that she was one of the tenants in the rooming-house at the time of the transaction in question. She was doing light-housekeeping. She stated that Mrs. Manzil and appellee went in the witness' room at the time the sale was made, and that Mrs. Manzil told the appellee that the trunk and the linen belonged to the witness; that is, by the term "linen," witness meant sheets, pillow-slips, towels and things like that. Witness owned the dishes and the silverware. Nothing was said about this. Witness had about three pots, seven or eight dishes, three or four forks and four spoons— something like that. Everything else in the room

belonged to Mrs. Manzil. Witness had just one room. On cross-examination witness stated that Mrs. Manzil didn't say anything to the appellee about witness owning the dishes, cooking utensils and things of that kind. Mrs. Manzil stepped to the trunk and told appellee that that belonged to witness and the linen belonged to witness. When witness moved out she left the mattresses, heating-stove, two chairs and a table. Witness went in another room where the roomer had her things packed to move out, and she had everything she had in two trunks. She took her silverware, dishes and linen. Things like that were about all you could use about a house.

Mrs. Manzil testified that appellee came to her house two or three days before the trade was made, and she showed her through the rooming-house with a view to selling her furnishings. Witness went in all the rooms and showed appellee all the beds, rugs and furniture that belonged to witness. Witness didn't furnish her house-keepers with dishes. The roomers got the linen and dishes. Witness told appellee everything three times. She stated that she told appellee that witness was occu-pying six rooms, and that if appellee could rent all the rooms she would receive $150 per month. She didn't tell her that she was getting $150 out of it. Witness was the owner of all the furniture in the house except the talking machine, two pillows and some linen and dishes, and everything that belonged to the roomers. There was no conversation between witness and appellee as to silver-ware, except she told appellee that the silverware and everything in the kitchen belonged to witness. Appellee bought the house from witness. Witness stated that, one time before the deal was closed, the appellee was in the room where one of the roomers was ready to move out. Appellee saw the room and everything packed up and in the trunk, and, after that, closed the deal with the appellants. Witness testified that they cashed the check. Witness was receiving on the rooming house at the time of the transaction $85 or $90. Witness stated that she had in the rooms furniture and kitchen stuff, and showed

her the things that witness owned. When witness left the house she took her clothes, trunk, suitcase and machine. She didn't take her kitchen furniture. She left everything that she had sold to the appellee. Witness then enumerates the various articles that the roomers possessed, consisting of pillows, blankets, linen, silverware and kitchen utensils. She showed appellee everything that belonged to her and everything that belonged to the roomers, and told her what went into the sale. The articles that she had enumerated as belonging to the roomers were shown to the appellee, and she didn't tell appellee that anything belonged to witness that belonged to roomers. Witness also enumerated the articles on a list that belonged to witness and which were sold to the appellee.

Manzil testified that he met the cashier of the bank on the street on his way to work in the morning between 7:15 and 7:20. He gave the cashier the check of appellee, who agreed to place the same to Manzil's credit.

The court found the facts to be as follows: "That said furnishings had been sold to plaintiff in bulk; that no itemized statement or list of same was made at the time of the sale, which was consummated and the notes signed and check delivered, as aforesaid, between the hours of 4 and 5 o'clock p. m. on the 1st day of May, 1922; that a considerable portion of the furnishings in said rooms in said rooming-house were owned by said roomers, a fact known by defendants but not known by plaintiff; that the defendant, Mary Manzil, falsely represented to the plaintiff that said rooming-house was paying a net sum of $150 per month, and, by this and other fraudulent representations herein mentioned, plaintiff was induced to sign said notes and sign and deliver to defendant the said check for $575; that at about the hour of 7 o'clock p. m. on the same afternoon that said sale was consummated, the plaintiff was advised by tenants occupying said property that she had been deceived by the defendant, Mary Manzil, in the matter of the owner-

ship of the property and the monthly income derived therefrom; that plaintiff immediately thereafter had a conversation with the defendant, Joe Manzil, in which she made complaint to him in reference to misrepresent-actions as to ownership of the property and its income, and desired to know of him what action he proposed to take in the matter, and he replied that he would do nothing, that she had purchased the property, and that he had the notes and the check. The court further finds that the defendant, Joe Manzil, on the following morning, May 2, 1922, appeared at the First National Bank long before banking hours, about the hour of 7:15 on said morning, and then and there cashed said check, the cashier of said bank, Albert Bullock, making payment. thereof; that at the hour of 7:30 a. m., May 2, 1922, plaintiff called said bank, and was advised by the book-keeper that said check had not been paid, and, upon plaintiff's request to stop payment thereon, promised to do so; that by reason of the false and fraudulent representations made to the plaintiff by the defendant, Mary Manzil, acting for herself and the defendant, Joe Manzil, and the fraudulent acts of said defendant in concealing from plaintiff the ownership of said property in said rooming-house, and by reason of her reliance on the truthfulness of the representations made as aforesaid, she was induced to and did part with the sum of $575 in cash, and execute and deliver ten promissory notes of $50 each, payable as herein stated; that the false, misleading and deceitful representations made by the defendants were made for the purpose of inducing plaintiff to part with her money and sign and deliver said notes; that said sale should be set aside for fraud, and that plaintiff should have judgment for the sum of $575, payment having been stopped on the check for $25; that said notes and each of them should be canceled; that said property now in the hands of a receiver should be sold and the proceeds appropriated to the payment of the sums due plaintiff under this decree.

The court thereupon entered a decree in favor of the appellee, from which is this appeal.

In *Leach* v. *Smith,* 130 Ark. 465-469, we said: "In determining the issues of fact by this court in chancery causes, no weight is given to the findings of fact by the trial court unless the evidence is so conflicting as to leave the minds of this court in doubt as to where the preponderance lies. Where the evidence is evenly poised, or so nearly so that we are unable to determine in whose favor the preponderance lies, then the findings of fact by the chancellor are persuasive. * * * The findings of fact by the chancery court are allowed to stand unless they are clearly against the preponderance of the evidence." See also *Morrow* v. *Merrick,* 157 Ark. 618.

In reviewing the facts of this record, surely it cannot be said that the findings of fact of the chancery court are clearly against the preponderance of the evidence. On the contrary, it occurs to us that the preponderance of the evidence shows that the chancery court was correct in its findings. Such being the case, the principles applicable to the facts of this record are quite familiar, and have been declared in numerous decisions of this court. Judge BATTLE, speaking for the court, in *Delaney* v. *Jackson,* 95 Ark. 131, 136, quotes language from some of our earlier cases as follows: "In order to vitiate a contract on the ground of fraudulent misrepresentation, the misrepresentation must relate to a matter material to the contract and in regard to which the other party had a right to rely, and did rely, to his injury. If the means of information as to the matters represented is equally accessible to both parties, they will be presumed to have informed themselves; and, if they have not done so, they must abide the consequences of their own carelessness." See cases there cited. There are many subsequent cases to the same effect.

The facts of this case bring it well within the doctrine of those cases. The decree is correct, and it is therefore affirmed.