## KAVANAUGH *v.* MORGAN.

### Opinion delivered October 18, 1926.

1. EVIDENCE—DECLARATION SHOWING INTENTION.—In ejectment where defendant claimed that plaintiff had agreed to discourage competitive bidding and to bid in the land at foreclosure sale at a low price and hold it in trust for him, plaintiff's letters written before the sale, calling attention of prospective bidders to the sale and stating that the bank was interested in seeing that the lands should sell for a good price, were admissible as tending to show plaintiff's intention when he purchased the land at the foreclosure sale.

2. TRUSTS—CONSTRUCTIVE TRUST—EVIDENCE.—Evidence *held* not to establish a constructive trust in land purchased at foreclosure sale by plaintiff, which defendant alleged that he agreed to hold for defendant.

Appeal from Union Chancery Court, First Division; *J. Y. Stevens,* Chancellor; reversed.

*Patterson & Rector, Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*J. N. Saye, H. S. Yocum* and *W. T. Saye,* for appellee.

HUMPHREYS, J.    This suit was originally brought by one of the appellants, C. C. Kavanaugh, against appellee, S. R. Morgan, and others, to recover possession of a certain lot in the city of El Dorado, Arkansas, upon the alleged ground that he was the owner thereof by deed of conveyance from the Central Bank, said bank having purchased same in a decree of foreclosure of a deed of trust executed to it by S. R. Morgan.

S. R. Morgan filed an answer, denying the material allegations in the complaint, and a cross-complaint alleging that said lot and the other property covered by the deed of trust was foreclosed under an agreement that all of the property described in the deed of trust should be purchased at the foreclosure sale by said bank and held in trust for him until he could dispose of enough thereof at private sale to liquidate the large indebtedness he owed the bank, at which time the remainder should be conveyed to him. He prayed that the cause be transferred to

equity in order that he might have an accounting from the bank, offering to pay any amount he might owe it, and requesting that the lot in question and the other unsold real estate described in the deed of trust and commissioner's deed under the foreclosure decree be returned to him.

The cause was transferred to the first division of the chancery court in said county, where it was tried upon the pleadings and testimony adduced by the respective parties. The court found the issues in favor of appellees, and rendered a decree divesting the title to the unsold real estate out of appellants and vesting same in S. R. Morgan, upon the payment of $11,135.75 to said bank by him within ten days; from which findings and decree an appeal has been duly prosecuted to this court for trial *de novo*.

The record reflects, according to the undisputed testimony, that, prior to the year 1921, S. R. Morgan, who was doing business with the Central Bank, drew drafts in large sums upon parties who did not honor them when presented for payment, and deposited the proceeds to his account in said bank. Before the drafts were dishonored and returned, he had checked out the money. These returned drafts swelled his indebtedness to the bank to the sum of $80,000, and, as he was unable to redeem them, the stockholders of the bank were compelled to double their stock in order to sustain the credit and solvency of said bank. Although a part of his indebtedness to the bank was secured by collateral, a large part of it was unsecured. In order to secure same, upon the urgent solicitation of C. C. Kavanaugh, the president of said bank, S. R. Morgan executed it a deed of trust upon his real estate in El Dorado and Union County. The indebtedness was reduced, by payments and collections on collateral from time to time, to about $53,000, in May, 1921, when foreclosure proceedings upon the deed of trust were instituted in the chancery court of Union County. A default judgment was rendered on August 4, 1921, for $61,537.77 in favor of the bank against S. R. Morgan, and

the real estate described in the deed of trust was ordered sold to satisfy said indebtedness. The commissioner appointed to execute the decree offered the real estate, after due notice, for sale at public auction on September 14, 1921, and the bank became the purchaser thereof for the sum of $10,000.

The sale was confirmed on December 5, 1921. After the sale the indebtedness involved in the foreclosure suit was carried on the bank books as accounts receivable, and the real estate was carried on the books until October, 1922, on the collection account instead of the real estate account. At that time, through the advice of attorneys, the real estate account of the bank was debited with $10,000, the bid for the real estate at the foreclosure sale.

C. C. Kavanaugh certified on December 31, 1921, immediately after the confirmation of the sale, that the bank owned $2,080.20 in real estate; and again, on March 10, 1922, he certified that it owned $4,142.76 in real estate; and again, on June 30, 1922, he certified that it owned $4,338.85 in real estate. In October, 1922, he debited the real estate account with $10,000, bid for the property at foreclosure sale, and on November 13, 1922, the books showed that the bank owned $14,268.05 in real estate. Mr. Kavanaugh gave two explanations as to why he carried the indebtedness of S. R. Morgan in the loans, discounts and collection account after the confirmation of the foreclosure sale, the first being that he did not know that it made any difference, until his attorneys informed him that the amount paid for the real estate at the foreclosure sale should be debited to the real estate account; and the second was that he did it as a matter of convenience, in order to make the accountings to the makers of the collateral notes, to Morgan, and to keep itself and the Bank Commissioner informed. Mr. Kavanaugh further explained that the Bank Commissioner understood how the transaction was handled from the beginning, and that he did not deceive, or intend to deceive, him by carrying the purchase price of the real estate at the foreclosure sale in the collection account and by not debiting

the amount to the real estate account until October, 1922. In this connection he stated that other foreclosure sales had been handled in this way and carried upon their books in the same manner.

After the confirmation of the foreclosure sale the bank paid all of the taxes on the real estate and all expense items pertaining to the real estate, charging same to its own expense account, and not to S. R. Morgan.

The lands in Union County embraced in the sale were wild and unimproved. Prior to the foreclosure sale, S. R. Morgan had leased one piece of the said property embraced in the mortgage to the Ark-Mo Lumber Company and had collected the rent for the term in advance. The term ended in 1923, at which time the bank leased the property to the Ark-Mo Lumber Company and collected the rent thereon. Another piece of said property was held by Downtain, who had purchased same and obtained a warranty deed from S. R. Morgan after he had executed the mortgage to the bank. M. B. Morgan erected three small houses upon another piece of the property, after the foreclosure suit, and, when he refused to account for the rents, this suit in ejectment was brought against the Morgans. There is some dispute as to who had possession of the other city property. Kavanaugh testified that he collected rents on one of the lots until the tenants moved out. M. B. Morgan testified that, after the date of the sale, he continued to look after all of the property, either for the bank or S. R. Morgan, or whoever owned it.

C. C. Kavanaugh wrote to eight different parties, prior to the date of the foreclosure sale, giving notice that the lands embraced in its mortgage, describing them, would be publicly sold on September 14, 1921, in which it was stated that the bank was interested in seeing that the lands should sell for a good price. One of the letters was addressed to Hon. Tom Gaughan of Camden. Gaughan mailed the letter to the Standard Oil Company,

and received a reply to the effect that it had checked the lands over and found nothing of interest to it.

On October 30, 1922, Kavanaugh wrote S. R. Morgan by registered letter as follows:

"S. R. Morgan,
Moore & Turner Building,
Little Rock, Arkansas.

"Dear sir:  Referring to your request to Mr. Simpson for an accurate statement of your account, beg to advise that the position which this bank takes, and has always taken, and has repeatedly explained to you, is that it is not seeking any profits out of foreclosure of real estate or collateral sales, but that it would be willing to resell to you any real estate which it has foreclosed and bought in, and surrender to you any collateral which it still holds in pledge, for the consideration of enough in cash to reimburse it for your present indebtedness and for such sums as it has paid out in foreclosure purchases, plus all expenses that it may have been put to. The bank does not hold the real estate which it bought in at foreclosure in trust for you for security for any indebtedness which you may owe it.  For instance, it foreclosed its mortgage on El Dorado and Union County property and bought it in at the sale by the commissioner at the consideration of $10,000.  This sale was afterwards confirmed, and the report of the said commissioner to the court shows that the Central Bank credited its judgment to the amount of $10,000, and this credit is extended to you on its books.  There would have been no object in foreclosing the mortgage and selling the property if it had been the intention of the bank to hold merely as security.  With reference to the items of expense, such as attorney's fees, abstract fees, railroad expenses, taxes, etc., which we have paid out on the El Dorado and Union County property purchased at the foreclosure sale, beg to advise that these items were charged to our own expense account at the time the items were paid, and were not charged to your personal account.  In writing you a memorandum, these items

were included for the purpose of advising you for how much we would be willing to sell to you the El Dorado and Union County real estate. We are offering the property we bought at foreclosure sale. If you wish to buy it, you can negotiate as any other person may do."

S. R. Morgan did not answer this letter.

In April, 1921, before the foreclosure proceeding was commenced, C. C. Kavanaugh wrote S. R. Morgan the following letter:

"For the future protection of yourself and the bank, we hope you will use your influence with the clerk at El Dorado to prevent unnecessary publicity of the litigation. Judge Hendricks has the papers prepared, and if you think it will accomplish any good in securing this matter out of the newspapers, I would accompany Judge Hendricks to El Dorado. As we see it, neither party would be greatly benefited by any undue publicity of litigation."

Mr. Kavanaugh explained that his reason for writing this letter was to avoid any damage which might result to the bank if publicity was given to the institution of such a large foreclosure proceeding. This concludes the statement of material facts revealed by the undisputed testimony.

The record reflects the following material conflicting testimony:

S. R. Morgan testified, in substance, that he and Kavanaugh agreed that the bank should institute foreclosure proceedings on the deed of trust against Morgan in the circuit court of Union County, take judgment against him for this debt, foreclose its mortgage, buy the property in at the sale for $10,000, thus freeing it from junior judgment liens, then to resell it at a private sale, as opportunity presented itself, apply the proceeds, first, to the payment of its indebtedness to it, and return the residue to him. He also testified that, in order to effectually carry out the plan, he agreed with Kavanaugh that he and his friends would not bid at the sale themselves, but would discourage competitive bidding, thus

permitting Kavanaugh to bid the property in for the sum of $10,000.

Five other witnesses testified that Kavanaugh had told each of them that he bought the property at the foreclosure sale, in trust for S. R. Morgan.

C. C. Kavanaugh testified that the bank never authorized him to enter into an agreement with S. R. Morgan to foreclose its deed of trust and bid the property in and hold same in trust for Morgan; that he did not enter into such an agreement with him; that the foreclosure of the deed of trust was a *bona fide* transaction, and that he bought the property at the sale for the bank, and not in trust for Morgan; that he never told any one, either before or after the foreclosure sale, that he had bought the property in for Morgan and was holding same in trust for him; that, in order to get bidders and make the property bring as much as possible, he wrote eight different parties about the sale, calling their attention to the date of the sale, in which he told them that the bank was interested in the property selling for a good price.

Testimony was introduced by appellees tending to show that the real estate was worth from thirty to fifty thousand dollars at the time of the foreclosure sale. Kavanaugh testified that he bid as much as the property was worth at forced sale, in view of the fact that some of it was in litigation, some had been leased, and that the title had failed to several hundred acres.

Appellant contends for the reversal of the decree because the evidence is not full, clear and convincing enough to have warranted the trial court in decreeing a trust *ex maleficio*. The requirements of the rule in such cases announced in *Tiller* v. *Henry*, 75 Ark. 446, 88 S. W. 573, and recently approved in *Eason* v. *Wheeler*, 167 Ark. 320, 268 S. W. 29, are as follows:

"Constructive trusts may be proved by parol, but parol evidence is received with great caution, and the courts uniformly require the evidence to establish such trusts to be clear and satisfactory. Sometimes it is

expressed that the 'evidence offered for this purpose must be of so positive a character as to leave no doubt of the fact', and sometimes it is expressed as requiring the evidence to be 'full, clear and convincing,' and sometimes expressed as requiring it 'to be clearly established.' * * * Titles to real estate cannot be overturned by a bare preponderance of oral testimony seeking to establish a trust in opposition to written instruments. The conservatism of the courts has prevented the tenure of realty being based on such shifting sands.''

The inherent probabilities in the instant case are that C. C. Kavanaugh did not make an agreement with S. R. Morgan to buy the property in at the foreclosure sale and hold it for him as trustee. The bank owned the deed of trust, and it had not authorized its president to make such an agreement. Certainly the president of a bank would not convert a deed of trust, securing a large indebtedness, into a complicated trust to run for an indefinite period, contingent upon being able to sell the property at private sale, without first consulting the directors and obtaining permission to make such an agreement. The transaction would have been one out of the ordinary course of business, and could not have redounded to the benefit of the bank.

A first mortgage was as good, or better, than an oral trust. Again, the plan was designed to strip the land of junior judgment liens, sell same, and, after paying the indebtedness to the bank, to pay the residue to S. R. Morgan. It is not probable that a bank in good standing, or its president, would have entered into an agreement of that kind. The unreasonableness of such a plan having been adopted by the parties is augmented by the fact that the bank paid the taxes upon the property for several years after buying it at the foreclosure sale, as well as the expenses incident to handling the property. Another strong circumstance tending to show that no such agreement was entered into, is that, according to the plan of Morgan, competitive bids at the sale were to be discouraged. The letters written by Kavanaugh

and mailed to prospective bidders, calling their attention to the sale, are in open conflict with Morgan's plan. Appellees contend that the letters were inadmissible, but we think that they were admissible as circumstances tending to show what Kavanaugh's intention was when he purchased the land at the sale. They clearly indicate that no agreement had been entered into by him to throttle competitive bidding and purchase the property for another. Declarations of this kind showing intention are admissible. Wigmore on Evidence, 2 ed., vol. 3, page 822.

Another strong circumstance tending to sustain Kavanaugh's version of the transaction is that Morgan failed to answer the letter Kavanaugh wrote and registered to him, in which he explained that he had not bought the property in trust for him, and in which he reiterated the terms upon which he (Morgan) might buy the property.

The first letter written by Mr. Kavanaugh to Mr. Morgan, and the manner in which the account was carried on the bank books after the confirmation of the foreclosure sale, are circumstances tending to support Mr. Morgan in his statement that there was an oral trust, but the explanation of the letter and the reason assigned for carrying the accounts as they were greatly minimize the force of those circumstances as corroborative evidence. The explanations are reasonable.

It is difficult from the testimony to determine definitely who had possession of the city property after the foreclosure sale was confirmed. M. B. Morgan testified that, after the sale, he continued to look after all of the property for the bank, or S. R. Morgan, or whoever owned it. He seemed to be in doubt whether he was acting in the management of the property for his brother, S. R. Morgan, or the bank. He tried to buy the property upon which he built three houses, from the Central Bank, after the houses were built. Under this condition of affairs, this piece of evidence is worth little

as a circumstance tending to show whether or not there was an oral trust.

The direct testimony upon whether there was an oral trust is conflicting.

In view of the open conflict in the testimony, we are of the opinion that appellees have failed to establish a trust *ex maleficio,* under the rule announced above. The testimony is not full, clear and convincing that the oral trust was agreed upon.

On account of the error indicated the decree is reversed, and the cause is remanded with directions to dismiss the crossbill of appellees for want of equity, and to decree the possession of the property to appellants.

McCULLOCH, C. J., (dissenting). The fact that the court treats as an essential part of appellants' case the declaration contained in Mr. Kavanaugh's letters to prospective bidders at the approaching sale constrains me to record my dissent, which I would not otherwise do upon any difference of opinion on the questions of fact, for I am convinced that the court is in error in holding that such declarations are competent as evidence in the case. They are self-serving—nothing more nor less—and inadmissible. The decision of the majority is in direct conflict with numerous decisions of this court. *Hamburg Bank* v. *George,* 92 Ark. 472, 123 S. W. 654; *Fechheimer-Kiefer Co.* v. *Kempner,* 116 Ark. 482, 173 S. W. 179; *Carter* v. *Younger,* 123 Ark. 270, 185 S. W. 435; *Donaghey* v. *Williams,* 123 Ark. 411, 185 S. W. 778; *Raymond* v. *Raymond,* 134 Ark. 484, 204 S. W. 311; *Davison* v. *Harris,* 165 Ark. 518, 265 S. W. 67. The citation of 3 Wigmore on Evidence, p. 822, in support of the opinion of the majority, is not apt. The author merely lays down the rule that self-serving utterances or declarations are only competent for the purpose of establishing the state of mind, "knowledge, belief, rational emotion, or the like," of the speaker, and not as substantive proof of the facts stated in the utterance. The chancery court found that the proof was sufficient

to establish the trust, and, in my opinion, the state of the proof in the record is such that I do not think those findings ought to be disturbed.