QUATTLEBAUM *v.* HENDRICK.

Opinion delivered May 6, 1929.

*Martin, Wootton & Martin* and *Moore, Gray & Burrow,* for appellant.

*Jay M. Rowland* and *Murphy & Wood,* for appellee.

MEHAFFY, J. This action was instituted in the Garland Chancery Court by Mrs. M. H. Quattlebaum against Max Hendrick, Max Hendrick, trustee, and Mabel R. Hendrick, wife of Max Hendrick, in January, 1927, seeking to impress certain real property and improvements thereon, in the city of Hot Springs, with a trust in favor of the appellant, and to compel the relinquishment of this specific property to the appellant. Appellant also asks judgment against Max Hendrick for the sum of $23,000 with interest from July 10, 1925, until paid, at the rate of 6 per cent. per annum, less the value of such trust properties as are ordered and decreed by the court to be conveyed to appellant by appellees.

Mrs. Quattlebaum, whose home was in Jefferson County, Arkansas, went to Hot Springs in the spring of 1924 to take the baths. She testified that her husband had just died.

Max Hendrick, whose wife and children were in Denver, Colorado, also went to Hot Springs in the spring of 1924. They met at the Townsend Hotel, being introduced by Mrs. Townsend. Hendrick was the owner of a closed car, and, after Mrs. Quattlebaum and Mr. Hendrick became acquainted, they went riding together a number of times. Mrs. Quattlebaum returned to her home, and then went to California. Before she left Hot Springs, however, she stated that she was going to Denver in the

summer of 1925, and Mr. Hendrick told her that he also would be in Denver at that time.

In July, 1924, while Mr. and Mrs. Hendrick were living together, she found letters in Hendrick's pocket written to him by Mrs. Quattlebaum. She immediately wrote to Mrs. Quattlebaum, and Mrs. Quattlebaum wrote her that she would not correspond with her husband any more, and Mr. Hendrick also agreed not to communicate with Mrs. Quattlebaum. This was satisfactory to Mrs. Hendrick, but thereafter she found another letter from Mrs. Quattlebaum, and she instituted suit for divorce, and obtained a divorce from Mr. Hendrick in November, 1924, at Fredonia, Kansas. Mr. and Mrs. Hendrick had two small children, a girl and a boy.

While in Hot Springs, Mr. Hendrick learned that Mrs. Quattlebaum had some money which was deposited in a bank at 4 per cent. interest. When they were in Colorado in 1925, they had arrangements by which Hendrick was to invest certain moneys belonging to Mrs. Quattlebaum in purchasing mortgages. Mrs. Quattlebaum was to receive 6 per cent. on the mortgages and Hendrick's pay was to be the difference between 6 per cent. and what was collected on the mortgages. There is no dispute or controversy about the money which was invested in mortgages, but, on July 6, she gave Hendrick a check for $23,-000, which she contends was given to him to buy Sinclair oil stock for her. Her contention is that he was to take it in his name and transfer it to her. Hendrick contends that the $23,000 was a loan, and that he bought the Sinclair stock for himself, and gave her his note for the $23,000.

When Hendrick began to purchase mortgages for Mrs. Quattlebaum they rented a deposit box at the United States National Bank of Denver, and the mortgages and papers connected with their transactions were deposited in this box, and each of them had a key. They also opened an account in the bank in the name of Hendrick-Hunt, Hunt being Mrs. Quattlebaum's maiden name.

It is the contention of the appellant that this $23,000 given to Hendrick was for the purpose of purchasing Sinclair oil stock for Mrs. Quattlebaum, and that it was a trust fund, and that this stock was sold and a part of the proceeds used to purchase the home of Mrs. Hendrick in Hot Springs, Arkansas, and that she was entitled to have this property conveyed to her or impressed with the trust because of the transaction with reference to the Sinclair oil stock.

When Hendrick was preparing to leave Denver, he and Mrs. Quattlebaum went to the bank, got their papers from the deposit box, went over them, and, among other papers in the box, was Hendrick's note for $23,000 to Mrs. Quattlebaum. At that time she said that she would not accept the note, and that she did not lend him any money, but that the oil stock was hers. Hendrick said the oil stock was his, and that he had borrowed the money from her and executed the note. The note was left with the bank, and the bank made several efforts to collect it after Hendrick had come to Hot Springs.

Hendrick not only claims that this was not a trust fund, but he also contends that the money which Mrs. Hendrick invested in a home in Hot Springs was received from other stocks which belonged to Mrs. Hendrick, and that all the money that went into the home was hers, and no part of it belonged to Mrs. Quattlebaum.

The chancery court found all the issues in favor of the defendant, Mabel R. Hendrick, and entered a decree accordingly. This appeal is prosecuted to reverse this decree.

The vital issue in this case is whether there was a trust created at the time Hendrick received the $23,000 from Mrs. Quattlebaum. Whether a trust has been created is largely a question of fact in every case, and it is proper, in determining the fact as to whether or not there is a trust, to give effect to the situation and relation of the parties, the nature and situation of the property, and the purposes or objects which the settlor

had in view. The burden of proving the existence of a trust rests on the person asserting it, and he must prove it by clear and satisfactory evidence, having in view all the surrounding facts and circumstances and the intention of the parties. 26 R. C. L. 1203.

The appellant testifies positively that the $23,000 was received by Hendrick to buy Sinclair oil stock for her, and that, while she agreed that it should be bought in his name, the understanding and agreement was that he was to transfer it to her. The testimony of Hendrick was just as positive that the $23,000 was a loan, and that there was no agreement that the stock should be transferred to her, but that the stock was to be his, and that he was to pay her, and he gave her a note for the $23,000. No one was present when Mrs. Quattlebaum and Mr. Hendrick made their agreement about the $23,000, and therefore no one knows what that agreement was except themselves, and their testimony on the question is in hopeless conflict.

While Mrs. Quattlebaum and Mr. Hendrick were having the numerous transactions with reference to property, Mrs. Hendrick was prosecuting a suit against Hendrick for divorce, and the undisputed proof is that Hendrick and Mrs. Quattlebaum were to be married. She evidently, at the time when she expected to marry Hendrick, had the utmost confidence in him, and they had a good many transactions after the transaction with reference to the $23,000. Hendrick bought mortgages in his name and transferred them to her, and spent large sums of money of hers, and no dispute arose over any of these transactions.

Mrs. Quattlebaum testifies that she suggested to Hendrick that he go back to his wife and children, and, shortly after he left Denver in October, he did go back to his wife, and they were remarried. Before leaving Denver, Mrs. Quattlebaum had become dissatisfied, and, as she says, suspicious. The evidence does not show the cause of her dissatisfaction or why she became suspicious.

This $23,000 transaction occurred in July, and they had a joint checking account, and also had rented together a deposit box, and this deposit box was kept by them, and the joint account was kept from July until October, although Hendrick had never transferred the stock to her, but had executed a note which she knew of and had put it in the deposit box with her other papers. The evidence however does not show that she knew this was in the deposit box, but when she and Hendrick went to the bank, Hendrick took out all the papers, and the $23,000 note was the last paper. This was in the presence of Mr. A. S. Brooks, a lawyer, who was vice president and trust officer of the United States National Bank of Denver, and he testifies that at that time Mrs. Quattlebaum stated that she did not know anything about the note until a short time prior to the date of the interview referred to; that she had given Hendrick $23,000 to purchase 1,000 shares of Sinclair Oil Stock for her, but that up to that time she had been unable to obtain the stock from Hendrick.

The undisputed evidence shows that Hendrick, some time about the latter part of September, sent the Sinclair oil stock to Arkansas, and that Mrs. Quattlebaum knew that he was doing this. Therefore, when Hendrick and Mrs. Quattlebaum went to see Mr. Brooks, and at the time they got the note out of the deposit box, both Mrs. Quattlebaum and Mr. Brooks knew that the oil stock had been sent to Arkansas. Mr. Brooks, of course, knows nothing about the $23,000 transaction and the purchase of the oil stock except what was told him at the time by Mrs. Quattlebaum and Mr. Hendrick, and, according to his testimony, Mrs. Quattlebaum claimed that the oil stock was hers and Hendrick claimed that it was his. He testified, however, that he asked Mr. Hendrick if he would not, without any regard to the merits of the controversy, send him the oil stock to be held as collateral, and that Hendrick promised to do this. This was in Mrs. Quattlebaum's presence.

Some correspondence was had between Brooks and Hendrick after Hendrick returned to Arkansas, and Hendrick finally declined to send the oil stock, giving as his reasons a conference had with Mrs. Quattlebaum in which he stated that she was so unreasonable that he had declined to do it. Thereafter Brooks undertook to collect the interest on the note and to collect the note.

It would be useless to set out the testimony in detail and review it here on the question of whether there was not a trust, but we have set out above the substance of the claims of each of the parties, and the evidence is in hopeless conflict.

This court, in a recent decision, quoted with approval from Pomeroy's Equity Juris., as follows:

"A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose, as, for example, the promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like, and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement." *Bray* v. *Timms,* 162 Ark. 247, 258 S. W. 338.

The court also, in the above case, said: "It is well settled by the above authorities that the parties seeking relief must establish the trust by clear and satisfactory evidence. The burden of proving the existence of a trust rests on the person asserting it, and he must prove it by clear and satisfactory evidence, having in view all the surrounding facts and circumstances and the intention of the parties. The same degree of proof should be required to prove an express trust as to establish a result-

ing trust, and the naked oath of one witness, without other corroborating circumstances proved, ought never to be held sufficient.''

In order to establish a trust by parol evidence, the evidence must be clear, convincing and satisfactory. It requires something more than the preponderance of the evidence.

''Constructive trusts may be proved by parol, but parol evidence is received with great caution, and the courts uniformly require the evidence to establish such trusts to be clear and satisfactory. Sometimes it is expressed that the 'evidence offered for this purpose must be of so positive a character as to leave no doubt of the fact,' and sometimes it is expressed as requiring the evidence to be 'full, clear and convincing,' and sometimes expressed as requiring it to be 'clearly established.' '' The above has been the rule of this court in an unbroken line of cases, from *Crittenden* v. *Woodruff*, 11 Ark. 82, down to the present time. *Scogin* v. *Scogin*, 176 Ark. 1009, 4 S. W. (2d) 953; *Kavanaugh* v. *Morgan*, 172 Ark. 11, 287 S. W. 1022; *Mann* v. *Mann*, 164 Ark. 43, 260 S. W. 731.

Again, this court said in a recent case: ''A trust *ex maleficio* must be established by clear, decisive and convincing evidence, not merely by a preponderance.'' *Lake* v. *Garrett*, 167 Ark. 415, 268 S. W. 608. See *Tillar* v. *Henry*, 75 Ark. 446, 88 S. W. 573; *Coleman* v. *Wigman*, 172 Ark. 132, 288 S. W. 376; *Dillard* v. *Battle*, 166 Ark. 241, 266 S. W. 80.

In this case the burden was upon the appellant to establish her claim by clear and convincing evidence.

While we have not set out or reviewed the testimony in detail, we have carefully considered all the testimony in the case, including the testimony with reference to the prosecution of Hendrick by Mrs. Quattlebaum, and also the evidence with reference to investments made by Mrs. Hendrick and evidence tending to show where the money came from, and, after a careful consideration of the entire

evidence in the case, we have reached the conclusion that the appellant not only did not prove her claim by clear and convincing evidence, but that the finding of the chancellor is supported by a preponderance of the evidence.

"The rule was early announced and has been consistently adhered to, that the findings of the chancellor will not be set aside by this court unless they are clearly against the preponderance of the evidence. This simply means that, on a trial anew of the issues of fact in a chancery cause on the record, as presented to this court on appeal, unless it is clear to our minds, that is, unless we are fully convinced as to which of the parties litigant is entitled to the decision, we accept and adopt the findings of the chancellor as our own, and treat them as conclusive. The meaning of the rule may be shown by this simple illustration: When chancery causes are taken up for determination by this court, the judicial balance, so to speak, stands at perfect equipoise. One side of the scales is labeled 'appellant,' the other 'appellee.' The testimony is examined, and all that is incompetent is discarded. That which remains for appellant is put on his side, and that for the appellee on his side, and, if the scales are evenly balanced, or so nearly so as to leave the judges in doubt as to where lies the greater weight, then the decision of the court below is persuasive, and is allowed to stand as the correct result. While the rule has been stated in different forms and in somewhat different language in various decisions of this court, the above, we believe, correctly states and illustrates the rule that chancery causes are tried *de novo* in this court, and that the findings of fact by the chancery court are allowed to stand unless they are clearly against the preponderance of the evidence." *Leach* v. *Smith,* 130 Ark. 465, 197 S. W. 1160; *State Bank* v. *Conway,* 13 Ark. 350; *Ringgold* v. *Patterson,* 15 Ark. 309; *Woodruff* v. *Core,* 23 Ark. 341; *Greeson* v. *Pool,* 31 Ark. 85; *Chapman* v. *Liggett,* 41 Ark. 292; *Gist* v. *Barrow,* 42 Ark. 521; *Skaggs* v. *Prince,* 176 Ark. 1170, 5 S. W. (2d) 340;

*Manzil* v. *White,* 161 Ark. 1, 255 S. W. 567; *Webb* v. *Alma Cash Store,* 160 Ark. 290, 254 S. W. 670; *Griffin* v. *Eustace,* 160 Ark. 508, 255 S. W. 12; *Markle* v. *Fallin,* 161 Ark. 504, 256 S. W. 841; *Linker* v. *Rachel,* 163 Ark. 426, 260 S. W. 440; *Morrow* v. *Merrick,* 157 Ark. 618, 249 S. W. 369.

Having reached the conclusion that the finding of the chancellor on this issue is supported by a preponderance of the evidence, it becomes unnecessary to decide the other questions discussed by learned counsel. There was a judgment against Hendrick in favor of Mrs. Quattlebaum for $23,000 and interest, but there is no appeal from this judgment.

The finding of the chancellor is not against the preponderance of the evidence, and the decree is therefore affirmed.