## DONAGHEY *v.* WILLIAMS.

### Opinion delivered April 24, 1916.

1. MONEY PAID—DEFENDANT'S REQUEST—RECOVERY.—In an action to recover money paid out by plaintiff at defendant's request in managing a political campaign for the defendant, the evidence *held* not to show that plaintiff had paid out the money claimed at the defendant's request.

2. MONEY PAID—PREVIOUS REQUEST—RATIFICATION.—To sustain a cause of action for money paid out on request, the previous request must be proved, or else it must be shown that the party for whose benefit the money was paid, ratified the payment after it was made.

3. MONEY PAID—REQUEST—PURPOSE OF EXPENDITURE.—In an action to recover money paid out on request, the plaintiff must show the specific purpose for which the money was expended, in order that it may be determined whether or not the money was spent for a legitimate purpose.

4. MONEY PAID—REQUEST—PURPOSE.—In an action by plaintiff, who managed a political campaign for defendant, to recover money of his own paid out at defendant's request, plaintiff must "lay his finger" upon the specific services rendered defendant, and for which he paid out his own money, and he can not recover money paid out without a showing that the same was paid out for legitimate expenses.

5. MONEY PAID—CHECKS—HEARSAY EVIDENCE.—In an action by plaintiff to recover from defendant, money paid out as manager of defendant's political campaign, checks and drafts, introduced by plaintiff, as independent evidence, made payable to plaintiff himself, introduced to show that he had paid out the various sums specified therein, are hearsay and self-serving and incompetent.

6. EVIDENCE—MONEY PAID—LETTER.—Where the testimony of the writer of a letter is the best evidence, the letter can not be introduced in evidence.

7. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—INSTRUCTIONS.—Where the scope of an agent's authority depends in whole or in part upon the instructions of the principal, such instructions may be given in evidence where they have been communicated to the third party.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge, reversed.

### STATEMENT BY THE COURT.

The appellee instituted this suit against appellant, and alleged in his complaint that appellant was running for Governor of the State of Arkansas, and about eighteen days before the primary election in 1912 requested the appellee to manage his campaign; that appellant stated that he had plenty of money and desired appellee to come into his headquarters and handle the financial end of the campaign, and specifically told appellee to run the campaign as if it were appellee's own campaign, to pay the debts and bills and that appellant would repay appellee and foot the bills. Appellee set forth various itemized checks and drafts which he drew in his own name on the Bank of Forrest City, amounting in the aggregate to $8,679.70; and these checks and drafts were paid and the money thus realized was paid out by appellee at the instance and request of appellant and for purposes connected with the expenses incident to the management of appellant's campaign for governor. The specific purposes for which most of the money was used appellee was unable to state. Appellee alleged that appellant borrowed from appellee the sum of $2,500, which sum appellee used, as the other moneys were used, for paying the expenses incident to conducting appellant's campaign for governor, but appellee was unable to state the particular purposes to which it was devoted by the parties to whom the money was paid.

The appellant denied that he had ever entered into a contract with appellee, as alleged in his complaint; denied that he had stated to appellee that he had plenty of money, and that appellee should run the campaign as if

it were appellee's own; denied that he had authorized appellee to pay out any money of his own, and denied that appellee had loaned or advanced him any sum whatever; and denied specifically that appellee had paid out at appellant's instance and request any or all of the sums mentioned in his complaint and that he had authorized appellee to incur any liability or debt of any kind on appellant's behalf, but alleged, on the contrary, that it was understood and agreed between appellant and appellee that appellee should not incur any indebtedness or liability of any kind on behalf of appellant, and that appellee would receive from appellant the sum of $2,500, which appellant instructed the appellee was the limit that the latter should pay for all expenses of every kind in connection with appellant's headquarters and in the conduct of the campaign; that in pursuance of this agreement appellant's headquarters were opened at the Capital Hotel, in the City of Little Rock, on March 11, 1912, and that appellee entered said headquarters as manager thereof, and appellant paid over to him the sum of $2,500; that thereafter, at the earnest solicitation of appellee, appellant's friends, without appellant's knowledge, paid over to appellee, in addition to the $2,500, the sum of $1,500, making the total sum of $4,000 which was turned over to appellee for the purpose of paying the expenses of the headquarters and campaign.

Appellant set up by way of counterclaim that appellee, in violation of his agreement and in excess of the authority given him, had incurred, in the name of the appellant, liabilities and indebtedness to various persons in large sums which appellant had been forced to pay, amounting in the aggregate to the sum of $7,664.44, for which appellant asked judgment over.

Appellee, in his reply to the counterclaim, denied specifically each item claimed by appellant.

The appellee testified, in substance, that he lived in Forrest City, and was engaged in the banking business there; that he, in company with Judge Rolfe and Mr. Buford, came to Little Rock on March 3 at appellant's re-

quest, and went to appellant's residence; that appellant told appellee that he (appellant) and his friends had decided that they wanted appellee to manage appellant's campaign; that appellee, Judge Rolfe and Mr. Buford told appellant that appellee could not manage his campaign; that they left appellant and went to the hotel, thinking the matter was ended; that afterward appellant called appellee over the phone and requested him to come back, which he did, in company with the same gentlemen as above, and they again went over the matter, and that then appellant said that he engaged rooms at the Capitol Hotel and wanted appellee to take charge of the campaign, saying that he would stand the expenses of headquarters; that he had plenty of money and expected to win, and wanted appellee to take charge of the campaign and handle it as though it was appellee's own business. Appellee still objected. The following week appellee, in appellant's behalf, made a trip to Hot Springs, and on his return he went to the Governor's office, and the Governor's friends insisted that he go by and see the headquarters that were being opened at the Capital Hotel, stating that the Governor was expecting appellee to come over and take charge of it; that he consented and went into the headquarters on Monday the 11th day of March, 1912, and found there Mr. Bullion, Judge Moore, of Helena, and Mr. Joe Frauenthal; that on that morning, Mr. Bullion handed appellee $1,000 in currency, saying "here is one thousand dollars for you to use, and when that is gone, there is plenty more," and probably two days thereafter he gave appellee another thousand, saying; "when that is gone there is plenty more;" that on the following Friday he told Mr. Bullion he needed some more money, and Bullion replied that he had only $500 more; that $2,-500 was all that he had.

Appellee then, over the objection of appellant, introduced various checks and drafts drawn in appellee's name on the Bank of Forrest City, which were paid; and appellee testified that the sums realized in this way were paid out to various parties whose names appellee men-

tioned, and that these sums were to be used in connection with the business of the headquarters and in conducting the campaign. He specified the purpose for which some of the money was used, and was not able to state the specific purposes for which other sums were used by the parties to whom such sums were paid.

Appellee stated that he kept no books and had no receipts or vouchers for most of the money paid out. In regard to the alleged loan of $2,500 he testified that on Sunday, March 17, in a conversation with appellant, appellant told appellee that he (appellant) had put up $2,500; that appellee stated that he had got the $2,500. Appellant then told appellee to put up $2,500 for him, and that he (appellant) would pay it back; that he did not want this to show in his expenses; that he told appellant that that would not be enough. Appellee testified that he paid out this last $2,500 "to fellows over the State; did not keep any account of it." He could not recall any bills that he paid, but the money was paid to people for services. No accounts were rendered. It was to people who did the best they could in campaign work; that is, witness presumed they did. Witness did not give everybody who came to headquarters money, but he gave a whole lot of them money; could not remember the names. He paid them for supposed to be services in the campaign; that while he was in the headquarters, about eighteen days, he spent a total of about $12,000 which did not include any newspaper bills or any clerical hire or any stenographer work; that all these expenses and bills were paid by Governor Donaghey, so far as witness knew.

Witness further stated that he did not render any statement to appellant of the sums that he had expended with a request for repayment except as to the $2,500 which he had loaned the appellant. He saw appellant on two or three different occasions, and on one occasion, when they were speaking about the finances, the appellant asked "How much is it?" Then appellee called up the bank at Forrest City and they replied that it was about $7,000, whereupon appellant said, "We will see about

that," stating that there was a settlement between them. The next time appellee saw appellant was at Forrest City where appellant came to see appellee about newspaper bills, and appellee did not demand any payment from appellant at that time or mention it to him; that on still another occasion, when appellant came to see appellee about the newspaper bills, he did not say anything to appellant about what he owed appellee. Appellee stated that appellant knew what he owed, or about what he owed; that he knew that he owed appellee something. He wrote appellant a letter about it, asking for $2,500. There was no difference between the $2,500 that appellee had loaned appellant and the balance that appellee had expended for appellant. Appellee was just demanding the $2,500 loaned to appellant because appellee did not think appellant would deny that, and appellee did not want any controversy. Appellee did not demand all that appellant owed him because he wanted to keep out of a political controversy or a newspaper controversy, which he detested. On October 2, 1912, he wrote appellant the following letter:

"Dear Governor: If convenient, I would appreciate it if you would let me have your check for the $2,500 which I loaned you during the recent campaign. Yours very truly, Eugene Williams."

About a year after this he authorized his attorney to take the matter up with appellant, and told his attorney that if appellant would pay him $2,500 to accept it, and that his attorney wrote to the appellant, stating that he had an account of appellee's against him for $2,500 for collection, and further stating: "I presume you know of this account and the correctness of the same. So forward me a check at your earliest convenience for settlement of the same," etc.

The testimony of E. A. Rolfe and T. A. Buford was substantially to the effect that they came to Little Rock with appellee at the request of appellant; that appellant requested the appellee to come over and manage his campaign, stating that he wanted him to take hold of it and run it like he was running his own business; that in the

course of the conversation appellant said: "That is all right about the money. I want Mr. Williams to come over here and finance this thing, and I don't think anybody else can do it but Mr. Williams."

One witness stated that appellant said that he had the money to foot the bills; that Mr. Williams must come; that he (appellant) was going to the country and would not be around and would need somebody like Mr. Williams, and that he was going to put enough money into the campaign to win.

Witness W. T. McCauley testified on behalf of appellee, by deposition, that he resided in Fort Smith; that he had met appellant there on March 18, 1912; that he wrote the following letter:

"Fort Smith, Ark., Feb. 18, 1912.
Mr. Gene Williams, Little Rock, Ark.

Dear Sir and Friend: I met my friend and our next Governor a few hours ago and he told me to write you and tell you to send me some funds to work on. I have been working for him ever since he announced and have not called on him before, and as you well know, it takes some money to work on. As to the amount use your own judgment, but send by return mail, as I am a poor man and cannot afford to spend any more of my own, but I do want to see George W. Donaghey elected Governor by a big majority. I am as ever,

Yours truly,
W. T. McCauley,
Captain of Police."

Witness was then asked: "If you say you met Governor Donaghey, tell where you met him and tell all he said about who was managing his campaign, and give his exact words as nearly as you can as to what he said in regard to you writing to Gene Williams about funds?" and answered, "I don't remember."

Appellant testified that he was acquainted with Buford and Rolfe; that some time the latter part of February 1912, Williams, Rolfe and Buford came to Little

Rock for the purpose of having a political conference with him, and in the conference on that day he mentioned that there was a request on the part of his friends for campaign headquarters to be opened up in the city. The conference was at appellant's residence, in the afternoon, on Sunday. There was another conference on Sunday night. At the first conference the gentlemen named were present at his request. At the second they came to his residence on their own motion. The gentlemen had come over to Little Rock at appellant's request, but not to talk about or to become campaign managers, but only for a political conference; that during this conference he asked Mr. Williams as to whether he would come over and go into the headquarters; that both Williams and Mr. Rolfe strenuously objected thereto, and appellant thereupon gave the matter up and never thought about it any more. Appellant first learned that Mr. Williams had become his campaign manager about March 16, 1912. On Sunday, the 17th, appellee came to see appellant twice. Appellee spoke to appellant about the finances and appellant told appellee that he (appellant) would not spend more than $2,500. Appellant thought that appellant ought to spend more, and appellant said he would not spend more, even though it would elect him. That was the first time appellant and appellee talked about the finances. During the conferences and conversations had with appellant while Rolfe and Buford were present many days earlier, there was not a single word said about any money; money was not mentioned at that time at all.

Appellant then testified that he had delegated to his agents Frauenthal and Bullion authority to secure a campaign manager. When appellant returned to Little Rock on March 17th he found that appellee had been secured as campaign manager, and that he was in charge. In a conference with him at his residence appellant asked appellee if word had been delivered to him as to what he was to spend, and he said it had, and appellant asked him how much he understood he was to spend and appellee

said $2,500, and said that he could not get along with that sum. Appellant then told appellee that he could not spend more than that even if it would get the governor's office for him; that he had made up his mind not to spend more than that, and he would not do it. He told appellee not to leave anything unpaid, stating to him distinctly, "You must confine every matter of expense within the $2,500," and appellee said nothing further about expenses. Appellant stated that he did not directly or in any other way authorize appellee to spend any more than $2,500, and the understanding between them was that the appellant himself should pay that amount.

Concerning the alleged loan of $2,500, appellant testified denying that he ever spoke to appellee with reference to borrowing $2,500 from him, or any other sum; that on no occasion did he ask the appellee to loan him $2,500; that he did not at any time state to appellee that he wished to borrow this amount and did not want the amount to appear in his campaign expenses. "There was never anything of that character or nature mentioned;" that he never did in any manner direct or suggest to the appellee that he wanted him to pay any money into the campaign, and never did expect him to do so. Appellant stated that appellee was not employed by him individually, when he was at his residence with Mr. Rolfe and Mr. Buford, but that he was secured through Mr. Bullion and Mr. Frauenthal, appellant's friends; that appellant expected Bullion and Frauenthal to select a different individual as appellant's campaign manager, and the first time that he heard that appellee had been secured was while he was away from the city on his campaign.

Appellant then testified to various bills of newspapers, stenographers and others, making a total of $7,760, which he had paid after the campaign was over, after a conference with his attorney, who advised him that under the circumstances he should pay them; that they were accounts made by Williams in his behalf, and he had paid them for the reason that he did not care to get into a controversy over those things. Appellant further

testified that after the campaign appellee told him that he had spent more money than he had been authorized to spend.

There was testimony on behalf of the appellant tending to show that he had authorized his friends, Bruce Bullion and Joe Frauenthal, to employ a campaign manager, and that he had directed that they should limit the amount to be expended by the manager employed to the sum of $2,500; that when appellee was employed he was informed by the gentlemen employing him of this fact. Bullion, one of the gentlemen who requested appellee to take charge of the campaign, stating "on the morning after the headquarters were opened up I had a conversation with Mr. Williams and told him that the appellant had left instructions to furnish him $2,500, which was the limit of the campaign expense which Mr. Donaghey would pay, which they agreed would be furnished in cash." Witness stated that he paid this sum over to appellee.

Witnesses testified on behalf of the appellant also that they had heard the appellee state, while he was managing the campaign, that $2,500 was all that he was authorized to spend in the campaign; that appellee was complaining because he had been limited to that sum, stating that he needed more money.

The appellant offered to prove by witness Frank Robbins that he was directed by Governor Donaghey to request Bullion and Frauenthal to make arrangements for opening up headquarters for appellant in Little Rock, and in doing so had directed them to limit the expenditures to $2,500. The court refused to permit the witness to testify and appellant saved his exceptions.

The court also refused to permit appellant to testify that he had Robbins to tell his friends to limit the expenditures of maintaining the headquarters and conducting the campaign to $2,500, and appellant excepted to the ruling of the court.

The jury returned a verdict in favor of appellee in the sum of $2,500. Judgment was entered accordingly,

and this appeal has been duly prosecuted. Other facts stated in the opinion.

*Mehaffy, Reid & Mehaffy* and *Sam Frauenthal,* for appellant.

1. This action is to recover money paid out at appellant's request and before appellee can recover there must have been such previous request, or a ratification of such payment. He had no right as a volunteer to pay out moneys of his own without a request from appellant. 27 Cyc. 837. Appellant repudiated the payments and no ratification is shown. Nor was there any contract to pay these moneys out of appellee's own funds. On the contrary all expenses of headquarters, etc., were to be paid by appellant himself.

2. It was error to allow appellee to introduce checks or drafts in evidence, because they were hearsay testimony and in the nature of self-serving declarations. 2 Jones on Ev., § 298, p. 640; 4 Chamberlayn on Ev., § 2756, 3088; 82 App. Div. (N. Y.) 202; 177 N. Y. 542; 131 *Id.* 169; 2 Aiken (Vt.) 133; 8 Enc. Ev. 626; 78 S. W. 744; 92 Ark. 472; 173 S. W. 179; 2 Jones on Ev., § 297; 7 Cranch (U. S.) 290, 3 Law Ed. 348. They were not even admissible as memoranda to refresh the memory of the witness. 1 Greenl., Ev. (16 ed.) 439 C; Wigmore on Ev. 763; 3 L. R. A. (N. S.) 1152; 5 Jones on Ev., § 883; 82 Ark. 485.

3. McAuley's letter was inadmissible as evidence and prejudicial. It was hearsay.

4. The court erred in refusing to permit Robbins to testify to the authority given by appellant in securing a manager and the limitation to $2,500 that should be spent. It is always proper to show the authority given by the principal to the agent and any limitations thereon. 31 Cyc. 1326; 80 Ark. 228; 105 *Id.* 111. Evidence of the agent is admissible to prove the fact of agency and its extent. 2 Gr. on Ev. (16 ed.), § § 60, 61, 64a; 2 Chamb. on Ev., § 1339; 31 Cyc. 1651. The power of an agent to bind his principal must be determined by the authority

given by the principal and a person dealing with an agent is at once put upon notice of the limitations of his authority. 23 Ark. 411; 62 *Id.* 33; 15 Kans. 492; 31 Ark. 212.

5. The court erred in giving instruction No. 1 for appellee and in refusing No. 5 for appellant. 31 Cyc. 1456, 1474.

*M. B. Norfleet, Coleman & Lewis* and *Carmichael, Brooks, Powers & Rector,* for appellee.

1. The finding of the jury is conclusive that appellee was entitled to $2,500. There was a conflict in the testimony and the verdict is final. 101 Ark. 51; 100 *Id.* 330; 103 *Id.* 260; 101 *Id.* 120; 90 *Id.* 100. The checks were admissible as evidence.

2. The jury's finding was right and in accordance with the great preponderance of the evidence and there was no error in the instructions. Appellant can not complain because appellee recovered less than he was entitled to. 89 Ark. 195.

Wood, J., (after stating the facts). The pleadings raise two distinct issues of fact: 1st, whether of not appellant requested the appellee to become his campaign manager, and, as such, to spend his own money in conducting the campaign for appellant with the promise on the part of the appellant to repay appellee the sums expended by him out of his own funds; and, 2nd, whether or not appellant borrowed of appellee the sum of $2,500.

I. While there is testimony to warrant a finding that appellant requested the appellee to become his campaign manager, there is no testimony whatever to warrant a finding that appellant requested the appellee to defray the expenses incident to the headquarters and the management of the campaign out of his own funds. On the contrary, the undisputed evidence is that the appellant himself was to pay the expenses of his headquarters and of conducting the campaign. The allegation of the complaint that appellant "desired the ap-

pellee to come into his headquarters and handle the financial end of the campaign and to pay the debts and bills and the defendant would repay the plaintiff whatever the plaintiff paid out," was sufficient to admit testimony on this issue, but the burden was on the appellee to prove this allegation, and he has failed.

(1-2)   The testimony of the appellee, and of the witnesses who corroborate him concerning the understanding between appellee and appellant as to the expenses of the headquarters and the campaign shows that these expenses were to be paid by the appellant out of his own funds, and not by the appellee.   Giving the testimony in favor of the appellee on this point its strongest probative force, it does not justify an inference that appellant intended that appellee should pay the expenses out of his own funds.   Appellee himself testified that appellant said, "he would stand the expenses of headquarters; he had plenty of money and expected to win.   He wanted me to take charge of the campaign and handle it as though it were my own business."

The testimony of other witnesses for appellee, who claimed to have heard what appellant said at this time, was to the same effect.

On this issue, the suit by appellee is to recover for money paid by appellee at appellant's request.   To sustain a cause of action for money thus paid the previous request must be proved, or else it must be shown that the party for whose benefit the money was paid, ratified such payment after it was made.   We have set forth the testimony as abstracted on this issue fully in the statement, and it fails to show any ratification whatever upon the part of appellant of the payments which appellee claims that he made in conducting appellant's campaign.   On the contrary, the only affirmative evidence in the record is to the effect that appellant repudiated these expenditures as soon as they were brought to his attention, and nowhere acquiesced in or gave his

assent to them. Appellee therefore, in paying out his own money for the expenses which he claims were incurred by him in conducting appellant's headquarters and campaign without any request upon the part of appellant so to do, was a mere volunteer, and he cannot hold appellant liable for such payments. 27 Cyc. 837 g.

The utmost that the testimony on behalf of the appellee tends to prove is that appellant requested him to manage his campaign, and that appellant would defray the expenses. But this is quite a different thing from a request by appellant of the appellee to pay the expenses himself out of his own funds with a promise of repayment by the appellant. Appellee's cause of action upon this issue must stand or fall upon the proof to the effect that the appellant specifically told the appellee to run the campaign as if it were his own business, and that he (appellant) would "foot the bill." This falls far short of a request on the part of appellant of appellee for the latter to "foot the bills" out of his own funds.

(3) The court therefore erred in submitting to the jury the issue as to whether or not appellee had either express or implied authority to spend his own money in behalf of appellant. Furthermore, even if appellee had proved that he had express or implied authority to spend his own money in conducting the headquarters and the campaign for appellant, the burden was upon the appellee to show the specific purposes for which the money was expended in order that it might be determined whether or not the money was spent for a legitimate purpose. Appellee kept no books and had no receipts or vouchers. Appellee testified that he knew the money he paid out was used in the campaign and for campaign purposes, but whether the parties to whom he paid it used it for that purpose he could not say.

During the cross-examination of appellee, he was asked this question: "You would just pay out anything anybody told you to when you were in there and you found them there?" and answered, "It seems so." And he further testified that he could not remember the names

of the persons to whom he paid money nor what they did. He stated that he paid them for services, and when asked what these services were replied: "It was supposed services in the campaign."

(4)   Now in order to justify a recovery on behalf of appellee against appellant it was incumbent upon appellee "to lay his finger" upon the specific services that were rendered the appellant for which appellee expended his own money.   Appellee could not expend his own money for appellant for *supposed services* rendered in the interest of the latter in connection with his campaign. Appellee would have to show that the money expended was in good faith and for a particular service rendered which would have been a legitimate charge against appellant.   A reckless, and indiscriminate expenditure of funds to anyone without inquiry as to the particular service rendered and without a showing that the service was a legitimate expense would tend to debauchery of voters and the corruption of elections.   A contract authorizing the expenditure of money in this manner would be contrary to public policy and void.

It is not necessary to discuss the instructions in detail.   What we have said would sufficiently indicate what the instructions should have been, and shows that the cause, on this issue, was not correctly tried.

(5)   II.   As independent evidence, the checks and drafts introduced by the appellee made payable to himself to show that he had paid out the various sums specified therein were but hearsay testimony and incompetent. 2nd. Jones on Evidence, sec. 298, p. 640, and sec. 297, p. 630; 4 Chamberlaine on Evidence, sec. 3088; *Simons v. Steele,* 82 App. Div. (N. Y.) 202, affirmed in 177 N. Y. 542.   See also, 8 Enc. Ev. p. 626.

Checks and drafts were drawn by the appellee and many of them made payable to himself.   On their face they do not show that appellant was in any manner connected therewith, and the evidence affirmatively shows that appellant was not present when the checks and drafts were drawn.   They related wholly to transactions

with other persons. These checks and drafts were but in the nature of self-serving evidence by the appellee, tending to corroborate his testimony that he had paid out the various amounts testified to by him on account of appellant. It was not competent for appellee to corroborate his testimony in this way. See *Hamburg Bank v. George,* 92 Ark. 472; *Fechheimer-Kiefer Co.* v. *Kempner,* 116 Ark. 482, 173 S. W. 179. The checks and drafts made payable to third parties would be competent to show the fact of such payment and would be relevant and competent testimony provided appellee went further and proved that he had authority to issue them and that they were given in payment for legitimate services rendered appellant.

It does not appear from the record that the checks and drafts were used merely to refresh the memory of appellee when he was on the witness stand, but that he was allowed to use them as independent evidence to corroborate his testimony as to the amounts he claimed that he had paid at the instance and in the interest of the appellant.

(6) III. The court erred in permitting the introduction of the letter written by W. T. McCauley to the appellee. The contents of this letter tended to show that appellant had authorized the writer to call on the appellee for money, and the purpose of the evidence was to show that appellee was correct in his contention that appellant had expressly authorized him to use his (appellee's) own funds in furthering appellant's campaign. Appellant was not present when this letter was written, and it was hearsay testimony.

As we have seen, there was no testimony to show that appellee was authorized to spend his money in conducting appellant's campaign. This letter tended to prove such fact and was highly prejudicial to the appellant. If such facts existed they should have been testified to directly by the writer of the letter, and the letter, in no case, could be used to bolster up the testimony of the witness.

IV. The court erred in excluding the proffered testimony of witness Frank Robbins. Appellant contends that appellee was procured as his campaign manager through his special agents for that purpose, Bullion and Frauenthal, and that these special agents were under limited authority to see that the campaign manager they selected did not expend of appellant's funds exceeding the sum of $2,500; that these special agents were instructed to limit the expenditures to that sum.

The testimony of Robbins tended to prove that such were the instructions of appellant to his special agents, Bullion and Frauenthal. Robbins was the instrumentality through whom these instructions were communicated from the appellant to his special agents, Bullion and Frauenthal.

The testimony of Bullion shows that he told appellee that "the appellant had left instructions to furnish him (appellee) $2,500, which was the limit of campaign expenses which Mr. Donaghey would pay, and asked him how he wanted the money furnished, which they agreed should be furnished in cash." Appellee does not deny that Bullion communicated to him these instructions.

(7) The law is well settled that where the scope of an agent's authority depends in whole or in part upon the instructions of the principal such instructions may be given in evidence where they have been communicated to the third party, although they are opposed to the apparent authority of the agent. See 31 Cyc. p. 1657, and cases cited.

V. The issue as to whether or not appellee had loaned the appellant the sum of $2,500 raised by the pleadings and the evidence, it appears was not submitted to the jury in the instructions of the court. The only issue submitted to the jury under the instructions was as to whether or not appellee was entitled to recover the money he claimed to have expended out of his own funds by the express or implied authority of the appellant.

Counsel for appellee contend that the evidence was sufficient to warrant the verdict for money loaned by the

appellee to appellant. While there was evidence on the part of the appellee tending to prove that he had loaned appellant the sum of $2,500, the testimony on this issue was conflicting, and inasmuch as the issue as to the loan was not submitted to the jury in the instructions, we must hold that the verdict was not responsive to such issue, but, on the contrary, was responsive to the issue as to whether or not appellee had expended his own funds at the instance and request of appellant, or under express or implied authority from him to do so, and, as we have shown, such issue was not properly submitted.

For the errors indicated, the judgment is reversed and the cause remanded for a new trial.