RATTON *v.* BUSBY.

5-1847 326 S. W. 2d 889

Opinion delivered May 25, 1959.

[Rehearing denied September 21, 1959]

668

 

 

*Barrett, Wheatley, Smith & Deacon* and *Kirsh, Cathey & Brown,* for appellant.

*Howard & McDaniel* and *Marcus Fietz,* for appellee.

Ed. F. McFaddin, Associate Justice. This litigation results from a collision of two airplanes which occurred over the Jonesboro airport on Sunday afternoon, January 19, 1958. The two airplanes were in final approach to landing. Appellant, Dr. R. W. Ratton, was flying alone in a single motor Beechcraft plane; Charles H. Busby and Billy Wayne Robinson were in a single-motor Cessna plane; and as a result of the collision Busby and Robinson were killed. Busby's administratrix filed this action against Ratton for damages; and from a judgment against him, Ratton brings this appeal.

There was no control tower at the Jonesboro airport: that is, no one was directing traffic and each pilot had to be his own judge as to when to take off and land. The Jonesboro airport has a "left-hand rectangular flight pattern": which means that planes about to land fly parallel with the landing strip on what is called the "downwind leg", then make a left-hand 90 degree turn to what is called the "base leg", and then when in line with the landing strip make another 90 degree turn into what is called the "final approach"; and the plane gradually glides to a landing. Usually, the elevation of the plane is about 800 feet on the downwind leg, and about 300 feet on the base leg, and then the plane goes to ground level in the final approach. Dr. Ratton professed knowledge of all the rules of the Jonesboro Airport, as well as the rules of the Civil Aeronautics Board, one of the latter of which (Rule 60.14 (e)) reads as follows:

*"Landing.* Aircraft, while on final approach to land, or while landing, have the right-of-way over other aircraft in flight or operating on the surface. When two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right-of-way, but it shall not take advantage of this rule to cut in in front of another which is on final approach to land, or to overtake that aircraft.''

On the day in question, which was a clear day, Dr. Ratton was flying his Beechcraft plane and had been practicing take-offs and landings. Deceased, Mr. Busby, was giving flight instruction to Billy Wayne Robinson in the Cessna plane; and they were also practicing take-offs and landings. Dr. Ratton admitted that he knew that Busby and Robinson were so engaged. The wings on the Beechcraft plane are located below the cockpit, so that visibility downward is only 45 degrees. The wings on the Cessna plane are located above the cockpit so that visibility above is only 45 degrees. Witnesses testified that both the Cessna and the Beechcraft came into the downwind leg at about the same time, with the Beechcraft plane above the Cessna plane; that both planes turned into the base leg in the same relative positions; that both planes turned into the final approach in the same relative positions; and that the Beechcraft plane in going down to the ground struck the Cessna plane below it, causing the Cessna plane to fall to the ground. Dr. Ratton was able to make a belly-landing with his Beechcraft plane. Thus, it is clear that under the landing rule quoted above, the Cessna plane, being of lower altitude, had the right-of-way, and that Dr. Ratton in the Beechcraft plane knew of this rule and, therefore, the failure to observe this rule was evidence of negligence.[1]

---

[1] In its Instruction No. 6 the Court told the jury: "In determining whether either Dr. Robert W. Ratton or Charles H. Busby was guilty of negligence, you may consider the following rules of persons flying airplanes, which have been developed by custom and recognized by law as duties required of pilots and planes. A failure to exercise ordinary care in their observation constitutes (evidence of) negligence.

"(a) All pilots of planes are required to exercise ordinary care for their own safety and the safety of others who may be flying.

"(b) It is the duty of all pilots to keep a constant look-out for and to anticipate the presence of other planes in the air, and to so fly their planes that they can avoid injury to themselves or others when danger may be expected or is apparent."

Counsel for both sides have shown knowledge, skill, and diligence in developing the facts and the applicable rules of aviation law,[2] so the questions presented on appeal relate to trial matters, rather than differences concerning the law of aviation. Appellant urges nine assignments of error which we group and discuss in suitable topic headings.

I. *Instructions.* Three assignments relate to instructions.

(a) In Instruction No. 7 the Court read various portions of the General Flight Rules of the Civil Aeronautics Board; one portion so read being: "Aircraft shall be operated at all times in compliance with the following general flight rules, and also in compliance with the visual rules which may be applicable". Appellant's objection was: "And we object to the giving of the instruction in its entirety and particularly to the language, '. . . and also in compliance with the visual rules which may be applicable' ". The appellant never made the objection any more specific than quoted. We see no merit in appellant's assignment. The jury was told that compliance with the visual flight rules related only to those ". . . rules which may be applicable". If the jury found that none was applicable, then the appellant was not hurt. *Wilson* v. *Southwest Casualty Co.,* 228 Ark. 59, 305 S. W. 2d 677, affords appellant no solace when considered in the light of appellant's sole objection, as above quoted. If appellant thought the words, "visual flight rules", should have been defined, he should have offered a definition. *Lemm* v. *Sparks,* 230 Ark. 105, 321 S. W. 2d 388.

(b) In the Instruction No. 7 the Court also read to the jury that portion of Paragraph 60.11 of the General Flight Rules, as follows: "Before beginning a flight, the pilot in command of an aircraft shall familiarize him-

---

[2] It was conceded that the Trial Court, and this Court on appeal, should take judicial notice of the Air Traffic Rules issued by the Civil Aeronautics Board, duly published in the Federal Register (see U. S. Code Title 44 § 307); and these were furnished in pamphlet form. Furthermore, the rules of the Jonesboro Airport were shown by consent; and we will refer to some of these in the course of this opinion.

self with all available information appropriate to the intended operation''. Appellant's objection to this portion of the instruction was that it was abstract. We see no merit to appellant's objection. The General Flight Rule as copied in the instruction, made it the duty of a pilot to familiarize himself with all available information appropriate to his intended operation. Part of this information was who had the priority of landing, which was Regulation 60.14 (e), as previously copied. It was for the jury to decide whether Dr. Ratton was familiar with that regulation and violated it.

(c) Dr. Ratton pleaded the contributory negligence of Mr. Busby as a bar to the plaintiff's recovery. The Court read to the jury Sections 1 and 2 of Act No. 296 of 1957 on contributory negligence, and then gave the jury two further paragraphs, the first of which was:

''Therefore, if you find from a preponderance of the evidence in this case that the defendant, Dr. Robert W. Ratton, was guilty of negligence in the operation of his plane which proximately caused or contributed to cause the damages complained of, then your verdict will be for the plaintiff, Mrs. Busby, in accordance with the measure of damages instruction hereinafter given you, unless you find that the deceased, Charles H. Busby, was guilty of contributory negligence in a degree equal to or greater than the negligence of the defendant, Dr. Robert W. Ratton, if any.''

The appellant does not argue that this paragraph was incorrect; but insists that at the end of the paragraph the defendant was entitled to have submitted the negative or converse. The appellant asked that the following be added at the end of the quoted paragraph:

''If, however, you find from a preponderance of the evidence that the deceased, Charles H. Busby, was guilty of contributory negligence in a degree equal to or greater than the negligence of the defendant, Robert W. Ratton, if any, and that such contributory negligence contributed to cause the accident, your verdict should be for the defendant, Robert W. Ratton.''

The appellant says that he was entitled to have his theory of the case submitted on the matter of contributory negligence, and cites, *inter alia, Prescott & N. W. R. Co. v. Weldy,* 80 Ark. 454, 97 S. W. 452; *Western Coal Co. v. Moore,* 96 Ark. 206, 131 S. W. 960; and *Western Coal Co. v. Harrison,* 122 Ark. 125, 182 S. W. 525. It is true that the appellant was entitled to have his theory of the case presented as to contributory negligence; but the theory was presented in the instructions as given, and there was no need for the Court to give the negative of the proposition at the conclusion of the quoted paragraph. Where the law has been clearly and adequately stated in a positive manner, ordinarily the Court need not instruct in a negative form. 88 C. J. S. 820 "Trial" § 303.

II. *Ruling Regarding Jury View Of The Damaged Wing Of The Cessna Plane.* One wing of the Cessna plane was preserved; and appellee wanted the jury to see that damaged wing, which was too large to bring into the court room. Early in the course of the trial counsel for appellee asked the Court if the jury could go to view the damaged wing; and the Court said: "You may take that up in chambers". The trial lasted five days; and on the fifth day the appellee again asked the Court if it would permit the jury to go to see the damaged wing of the Cessna plane. At first the Court said that the jury might view the wing if there was a showing that it was in the same condition as of the day of the collision; but later the Court told the jury:

"There has previously been an offer by counsel for the plaintiff to view certain portions of the aircraft, the Cessna aircraft involved in this collision. The jury is instructed that the statutes provide that the jury may, in the discretion of the court, view real property in litigation or the place where a particular thing happened, but in view of the fact that the testimony does not disclose that the aircraft is now in the same condition that it was at the time of the collision — that is, assembled and so on — that the offer of view is refused, and the jury is instructed to pay no attention whatsoever to the offer of the view. They should not consider the offer to view in their deliberations in any manner whatsoever."

Notwithstanding this ruling, appellant insists that the appellee caused irreparable damage to the appellant by making *in open Court* the request that the jury view the damaged wing. It is appellant's contention, that any request that a party may make to the Court for the jury to view anything, must always be made in chambers and never in open Court, because — says appellant — when the opposing counsel objects to the view, the jury concludes that the opposing counsel is trying to conceal something. In support of his position, appellant cites, *inter alia: Woodrum Truck Lines* v. *Bailey* (Tex. Com. App.), 57 S. W. 2d 92; and also *National Box Co.* v. *Bradley,* 171 Miss. 15, 157 So. 91, 95 A. L. R. 1500, together with subsequent Mississippi cases. The Texas case is based on a Texas statute that prohibits views. We need not consider the Texas case, since our statute provides that the Court may allow view in certain instances. The question, then, is whether a request for the view must *always* be made in the absence of the jury. The Mississippi cases are strong in that regard, when the appellant duly preserves his record. But it has never been the rule in Arkansas that a request for view must in all instances be made in the absence of the jury. The Arkansas statute (§ 27-1731) vests the Trial Court with discretion in the matter of refusing or allowing the view. The statute does not say that the request for view must be made in the absence of the jury;[3] and we would be reading into the statute something that is not there if we should so hold. The question is whether there was prejudicial error committed; and in the ruling of the Court here challenged, it is clear that there was no prejudicial error. The Court instructed the jury that there was no sufficient showing that the damaged wing of the Cessna plane was like it was the day of the collision; and in thus giving a reason for refusing the view, the Court certainly made clear to the jury the fact that it was *the Court* refusing the view, rather than the appellant

---

[3] For some cases from other jurisdictions with situations similar to the Mississippi holdings, see: *Seininski* v. *Wilmington Leather Co.,* 26 Del. 288, 83 Atl. 20; *C. R. I. & P. Co.* v. *Turner,* 206 Okla. 340, 243 Pac. 2d 673; *Gooding* v. *Koonce* (Idaho), 306 Pac. 2d 657; and *Fitzpatrick* v. *Sooner Oil Co.* (10th Cir.), 212 F. 2d 548.

trying to "hide something". We see no prejudice resulting to the appellant in the Court's ruling.

III. *Rulings As To Evidence.* Three separate rulings are questioned.

(a) The plaintiff called the witness, George Disinger, who had been operating the Jonesboro Airport since 1943 and had worked in airplane mechanics since 1937. Disinger was a pilot with over 3,000 hours to his credit, and had a commercial license with instructor's rating from the Federal Government. He was familiar with the planes involved in the collision, and testified as to these planes. It was shown that the Beechcraft plane had a tricycle retractable mechanism for landing. The witness had examined the Beechcraft plane immediately after the collision, and some time later had taken a moving picture of the plane and the landing gear. Disinger was asked: "When the nose wheel is down in locked position, such as indicated here on the model, defendant's Exhibit 1, is it possible to break that bell crank you have referred to with a lick against the front wheel or nose wheel?" The witness was allowed to answer the question over objection. Then Disinger was asked: "What is your opinion whether or not the nose wheel was or was not being retracted at the time it broke the bell crank?" That question was also allowed to be answered over the objection of the appellant. Appellant says the Court erred in allowing Disinger to give an opinion as an expert witness on these matters. We see no error committed by the Trial Court in allowing the witness to answer the questions. The appellant concedes the witness' qualifications to testify as a mechanic; but insists that he is not qualified to testify as to "stresses, strains, and strength of materials". We have previously stated some of Disinger's experience and qualifications; and we think it was proper to allow him to answer the questions. The question of the competency of the witness to express an opinion is largely within the discretion of the Trial Court. *Fireman's Ins. Co.* v. *Little,* 189 Ark. 640, 74 S. W. 2d 777; and *Ark. P. & L.* v. *Morris,* 221 Ark. 576, 254 S. W. 2d 684. The jury alone determines the value of, and the weight to be given, ex-

pert testimony. *Home Ins. Co.* v. *Jelks,* 187 Ark. 370, 59 S. W. 2d 1028; and *Western Union Tel. Co.* v. *Turner,* 190 Ark. 97, 77 S. W. 2d 633.

(b) The witness, Disinger, had also taken a picture of the Beechcraft plane after the accident; and he was allowed to set up a moving picture projector and exhibit the moving picture to the jury. Appellant insists most vigorously that Disinger was allowed to make oral comments about the pictures as he was showing them; and appellant claims that this was fatally defective. We have carefully read the testimony, and it was shown that the picture could be stopped at any time and any questions could be asked by counsel for either side as to what the picture showed and the record made as in case of a still picture. The showing of the picture consumes between four and five minutes. With the transcript and the picture before us, we are thoroughly able to understand Disinger's testimony. Every time he stated what the picture showed, he was cautioned: "No comments"; and the showing of this picture was no more than the showing of any still picture. We see no error.

(c) Finally, on the matter of evidence, appellant complains that he was not allowed to introduce into evidence the report which he made to the Civil Aeronautics Authority several hours after the collision. Certainly the report was not a part of the *res gestae,* because the making of the report was too far removed from the time of the collision to constitute *res gestae.* *Fordyce* v. *McCants,* 51 Ark. 509, 11 S. W. 694; and *St. L. I. M. & S. Ry.* v. *Enlow,* 115 Ark. 584, 171 S. W. 912. Neither was the report offered to impeach the testimony of any witness called by the appellee. All the report could have done would have been to constitute a self-serving declaration of the appellant; and was, therefore, inadmissible. *Donaghey* v. *Williams,* 123 Ark. 411, 185 S. W. 778; and *Webster* v. *Goolsby,* 130 Ark. 141, 197 S. W. 296.

IV. *Excessiveness Of The Verdict.* The jury returned a verdict for the appellee for the sum of $62,-887.50 and the appellant claims that this amount is grossly excessive. It is a large sum of money; but the ap-

pellee and her children suffered a great loss. Mr. Busby was 32 years of age at the time of his death. He was survived by a wife and two children, who were aged 9 and 5 respectively. Mr. Busby had been flying 12 or 13 years; he was a flight instructor; his earnings were $300.00 a month plus commissions on sale of planes; he used all of his income for the support of his family. There is no evidence of any conscious pain or suffering; but a man of Mr. Busby's age had an expectancy of 38 years. His salary of $3,600.00 a year, not taking into consideration the commissions from the sale of planes, would make a sum appreciably greater than the verdict, even calculated to its present cash value. What the two children have lost in the death of their father can hardly be placed in dollars and cents. While the verdict is large, we cannot say that it is so grossly excessive as to shock the conscience.

V. *The Conduct Of The Trial.* Finally, we come to the assignment which has given us the most serious concern. The appellant insists that he was deprived of the fair and impartial trial which the law guarantees to every litigant; and the appellant says this result came about because of three factors: (a) the Trial Judge asked the witnesses a total of 160 questions in the course of the trial; (b) the Court invited the jurors to ask questions of the witnesses while they were testifying; and (c) during a recess of the Court the jurors went to the Judge and asked if a witness could be recalled for further questioning. Because of these matters, appellant claims he is entitled to a new trial; and because of the seriousness of these charges we have examined the transcript page by page.[4]

We have concluded that the trial was fairly conducted and no new trial should be ordered. The trial con-

---

[4] We have not counted the number of questions asked by the Trial Judge and the jurors; but counsel for the appellee make this statement in their brief, which is not controverted by the appellant in the reply brief:

"We have endeavored to make an accurate count and this count shows that 2,964 questions were asked in the course of the trial. The plaintiff asked 1687 questions, the defendant asked 1098 questions, the court asked 134 questions, and members of the jury asked 45 questions."

sumed five days, and involved a collision of two airplanes. The witnesses who knew and flew airplanes used a vocabulary that, while clear to pilots and flyers, is almost an unknown language to persons who are not "air-minded"; and in order to understand the testimony, the Court and the jury asked many questions. For instance, questions were asked about such matters as the down-wind leg, the base leg, the final approach, left-hand rectangular flight pattern, altitudes, banking, visibility, bell crank, range of vision in banking, and many other such matters, which certainly needed explanation to a jury of laymen. Again, when small hand-size model planes were offered to depict the two planes involved in the collision, the Court very wisely inquired and learned the pertinent fact that neither model plane was constructed to scale; and one juror asked and was informed that the windows in one of the model planes were different from those of the plane it was supposed to depict. On the very vital matter of the correct way to land a plane, both the Court and the jury asked as to permissible variances in elevation and course in the down-wind leg and the base leg of the descent.

When the witness, Disinger, was telling the point of impact on the Cessna plane, he said: "About four feet on the root of the wing on the rear spar at a slight angle to the spar". It was certainly proper for the Court to ask the witness: "What do you mean by root?"; and "What is the spar in a wing?" If this had been a case involving the collision of two automobiles, probably most of the members of the jury would have understood the expressions used by the witnesses: but in a case involving the collision of two airplanes, it was certainly essential that the jury understand the terminology used by the witnesses. Nearly all of the questions asked were propounded to experienced aviators, like the witness, Disinger, and the witness, Fulkerson; and we conclude that the jury showed a becomingly keen desire to understand the testimony. On the second day of the trial, and before any objection or motion for new trial was made by appellant, the Court on its own motion told the jury:

"The Court is asking these questions simply for the purpose of determining the law to be given to the jury, and . . ., as I have told you in the general instructions at the time the general charge was given to the jury panel, no question asked by the court is ever intended or meant as a comment upon the testimony or credibility of any particular witness. The court is asking these questions simply for the purpose of determining the law, the various statutes to be determined in instructing the jury. and for no other purpose."

On the morning of the third day of the trial, appellant's counsel in chambers made the first objection to interrogation by the Court or the jury. This was in the form of a motion for mistrial; and the proceedings in chambers consume eight pages of the transcript. It would unduly prolong this opinion to copy all of these pages; but the gist of such proceedings is that the appellant insisted that the questioning by the Court and the jury had ". . . unintentionally prejudiced our rights of defense in this case". The Court explained to the counsel:

"The entire inquiry by the jurors was with reference to whether or not they could ask questions and whether or not they could have a particular witness back . . . At a time when the Court had told the jury they might have a recess under the usual admonition of the Court, and as the Court stepped down from the bench, one of the jurors motioned to the court and in the presence of the entire jury panel in open court made this statement: 'Judge, is it proper for a juror to ask questions', to which the court replied: 'Yes, ma'am', this in the presence of the entire jury panel, 'but if you ask an incompetent question, the court will have to so instruct you' . . . Let the record show that as soon as the juror made this statement, counsel was immediately informed at that time. No objection was made by counsel on either side as to whether it is proper for a juror to ask questions . . . The court is not trying to try your lawsuit. The court has some obligation to see justice is done and jurors can intelligently pass on the facts . . . I am afraid you gentlemen are overlooking one

thing: trial of a lawsuit is not a battle of wits. Trial of a lawsuit in a court of justice is to arrive at justice, and that is what the court is trying to do.''

After overruling the motion for mistrial in chambers, the Judge immediately in open court told the jury:

''Ladies and gentlemen of the jury, the court in the general instructions at the time the entire jury panel was present in court instructed the jury that from time to time the court might ask questions, either for the purpose of determining the law applicable to the case, the instructions to be given, or for the purpose of clarifying something in the court's mind. The court in this case has asked a number of questions. The jury is instructed and told at this time, as they were in the general instructions, that no question asked by the court is intended or meant as any comment upon the weight of the evidence or the credibility of the witness. The jury is the sole and exclusive judge of the evidence, of the weight thereof, and of the credibility of the witnesses, and no question asked by the court should be taken by the jury as any inference or comment by the court in any manner on the testimony of any witness or the credibility of any witness or the weight you should give them.''

The questions asked by the Court and the jury certainly served to clarify the testimony so that we, as an appellant Court, are better able to understand the factual situation than we would have been if such questions had not been asked. No question asked by the Court was objectionable as violating rules of evidence; and no questions, separately or altogether, show any view of the Court or the exertion of a conscious or unconscious influence on the jury's verdict.

In *Sharp* v. *State,* 51 Ark. 147, 10 S. W. 228, and in *Arkansas Central Rd. Co.* v. *Craig,* 76 Ark. 258, 88 S. W. 878, we had occasion to discuss the conduct of the Trial Judge in asking questions; and what we said in those cases is our rule in Arkansas today. We quote excerpts from these two cases and reaffirm them as the governing principles:

"The judge has the right, in a criminal prosecution, to interrogate the witnesses, but he has no right to usurp the place of the State's attorney, 'and prescribe the order of introduction of the witnesses and become active in their examination'; nor has he the right to assume the duties resting on the prisoner's counsel in the general conduct of the defense. He may ask questions which the attorneys had the right to propound and failed to ask, when the answers to the same may tend to prove the guilt or innocence of the accused. It would be a reproach to the laws of the State if he was required to sit and see the guilty escape or the innocent suffer through a failure of parties, or their attorneys, to ask a witness a necessary question . . . In all trials the judge should preside with impartiality. In jury trials especially, he ought to be cautious and circumspect in his language and conduct before the jury. He should not express or intimate an opinion as to the credibility of a witness or as to controverted facts. For the jury are the sole judges of fact and the credibility of witnesses; and the constitution expressly prohibits the judge from charging them as to the facts . . . Any expression or intimation of an opinion by the judge as to questions of fact or the credibility of witnesses necessary for them to decide in order for them to render a verdict would tend to deprive one or more of the parties of the benefits guaranteed by the constitution, and would be a palpable violation of the organic law of the State."

"Counsel for appellant contends with much force that the judgment should be reversed because the presiding judge during the trial propounded questions to the witnesses for plaintiff and defendant. The contention is not that these questions were improper, had they been propounded by counsel for plaintiff; but the contention is made that, by propounding a number of questions, the judge thereby assumed the role of attorney, and in that way indicated to the jury his opinion of the evidence, and prejudiced the rights of the defendant. It is true that a judge, under our law, should neither directly nor indirectly indicate to the jury his opinion of the facts in the case, when the same are in dispute, and when

the jury are to determine what the facts are . . . It seems to be the general rule, well supported by the decided cases, that the trial judge has the right to propound such questions to witnesses as may be necessary in order to elicit pertinent facts, in order that the truth may be established. Of course, this must be done in a reasonable and impartial way, so as not to indicate his opinion of the facts, and thereby prejudice the rights of the parties . . . It is not usually necessary that the judge should propound many questions to witnesses, and for the judge to take the case out of the hands of counsel, and take the lead in the examination of witnesses might at times be improper and prejudicial. But it would be a reproach to the law, if he were required to sit still in either a civil or criminal trial, and see justice defeated through a failure of counsel to ask a witness a pertinent question.'"[5]

Regarding the right of jurors to ask questions, the general trend of the holdings is summarized in 58 Am. Jur. 311 in this language:

"The fact that the trial judge gave the jury permission to interrogate a witness without any special request from them for the privilege has been held not to constitute error so long as the questions asked are germane to the issue. Conceding the propriety of permitting a juror to examine a witness, the examination may be carried out in such a manner or under such circumstances as to warrant the trial court in declaring a mistrial or granting a new trial, or it if fails or refuses to do so, to warrant a reversal by the reviewing court; this largely depends upon the facts of the individual case. But it may be said that, generally speaking, the courts have been reluctant to require a reversal or new trial because of the manner in which a juror examined a witness. It has been held not to be error to permit questions by the juror concerning matters that might

---

[5] In 84 A.L.R. 1172 there is an extensive annotation entitled: "Propriety of conduct of trial judge in propounding questions to witnesses in criminal case." In L.R.A. Vol. 1916A at Page 1191, there is an annotation entitled: "Power of Court to call and examine witnesses"; and in 159 A.L.R. 347 there is an annotation entitled: "Propriety and effect of examination of witnesses by jurors".

properly have been elicited on the direct examination of the witnesses, if they are such as tend to clarify material points in the testimony.''

We have gone into this matter in considerable detail to show that the trial was fairly conducted and that the appellant's motion for mistrial was properly denied. After considering all of the appellant's assignments, we conclude that the judgment should be affirmed.

HARRIS, C. J., and WARD and ROBINSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting.

This case grew out of a collision between two airplanes. There does not appear to be anything particularly complicated about the facts. It is just a question of who, if anyone, was negligent.

One of the issues on appeal is the action of the trial court in propounding to the witnesses approximately 165 questions in the course of the trial. The magnitude of this number of questions will be understood when the fact is taken into consideration that a total of only about 3,000 questions was asked all the witnesses. Appellee was the plaintiff, and of course had the burden of proving negligence on the part of the defendant, appellant. The plaintiff was represented by able counsel fully capable of presenting properly their client's case and, in fact, looking after their client's interest in any court. Two of the allegations in the complaint, of negligence on the part of the defendant, are as follows: ''In failing to keep a lookout for the plane in which the deceased was flying''; and further, ''in failing to pull his plane directly up instead of giving it the throttle and more power when he discovered or should have discovered the plane in which the deceased was flying''.

Plaintiff introduced as a witness one Bill Farrell, an experienced airplane pilot. During the cross-examination of this witness, defendant introduced a small model representing the Beechcraft Bonanza low wing plane operated by the defendant at the time of the collision. One of the principal issues was whether the defendant from his position in the Bonanza should have seen the other plane.

Immediately upon the introduction of the small model, the court took over the examination of the witness and at this point three pages of the record are required to record the examination of the witness by the court on how the plane was constructed, the dimensions, etc. Finally counsel for the defendant objected to questions propounded by the court. Apparently the effect of this testimony brought out by the court in the eyes of the jury could have been that the defendant was situated so that he could have seen the other plane.

In his answer defendant had alleged that the Cessna plane occupied by the deceased had dual controls and that the deceased was negligent in permitting the student pilot, Billy Wayne Robinson, "a totally inexperienced pilot, to assume control or joint control of the plane with the decedent Busby". In the cross-examination of the witness Farrell, a small model of the Cessna plane occupied by the deceased was introduced in evidence. At this point the court took over the examination of the witness and developed the fact that the plane did not have dual controls. This evidence refuted the allegation in defendant's answer to the effect that the deceased was negligent in allowing the student, Billy Wayne Robinson, to assume joint control of the plane through the use of the alleged dual controls. Of course, this was a point very much in favor of the plaintiff, and the effect on the jury was much greater than if the point had been developed by questions propounded by counsel for plaintiff. Moreover, to preserve the record properly, counsel for defendant was compelled to object, in the presence of the jury, to questions asked by the court. This may have put defendant's counsel in an unfavorable light before the jury.

Counsel for appellant in this case are lawyers of many years' experience at the bar; they are known by the members of the legal profession of this State as lawyers of ability and lawyers who have the utmost respect for the courts. The last thing such lawyers would want to do would be to take exceptions to some action on the

part of the trial court that was initiated by the court, and yet that is what has happened in the case at bar. Through their sense of duty to their client counsel for defendant felt that they were compelled to move for a mistrial after the second day of the trial, because of questions propounded to the witnesses by the court.

Usually cases that are tried before juries by able lawyers can be decided either way. Most jurors are inexperienced, and in many instances even after the arguments have been completed and the case has been submitted to the jury, many jurors are undecided which way they should vote. They are uncertain which way their verdict should be. If the trial court has given any indication of the court's opinion about the matter, many jurors feel that it would be safe to follow along that line.

Witnesses are put on the stand to prove relevant and material facts. Of course, the evidence is not admissible unless it is relevant and material. When a fact is developed by questions asked by the court, such fact carries far greater weight than if it had been proved by testimony developed by counsel for the side helped by such facts. Moreover, when the court asks a large number of questions, there is extreme danger of one or more jurors getting an impression from the questions asked and the facts thereby developed, that the court has an opinion on the merits of the case, when in fact the court has no such opinion. And this is the very thing that may have happened in the case at bar, from the extremely large number of questions asked by the court.

This is not to say, however, that the court must sit quietly by and see a miscarriage of justice take effect because a lawyer on one side is completely outclassed by his adversary, nor does it mean that the trial court should not aid a young and inexperienced lawyer who needs help. From time immemorial it has been the custom and practice of courts to take care of situations of that kind. But where both sides are represented by counsel of the caliber appearing in the case at bar, they should be allowed to try their case and develop it according to their

own judgment, complying, of course, with the rules of evidence.

In my opinion appellant's motion for a mistrial should have been granted and for that reason the judgment should be reversed.

I am authorized to say that the Chief Justice and Mr. Justice Ward join in this dissent.