Sharp v. State.

## SHARP v. STATE.

1. HOMICIDE: *Cause of death: Maltreatment of wound.*
   Where one unlawfully inflicts on another a dangerous wound which proves to be mortal, he is guilty of murder or manslaughter, according to the circumstances of the case, although it may appear that unskillful or improper surgical treatment aggravated the wound and contributed to the fatal result.

2. CRIMINAL PROCEDURE: *Instructions: Practice on appeal.*
   This court will not review the refusal of the trial court to give an instruction asked for by the defendant, where all it contains that could have benefitted him was given to the jury in other instructions.

3. SAME: *Examination of witnesses: Remarks of judge.*
   On the trial of a criminal cause the presiding judge may ask a witness any question which either party has failed to propound, and the answer to which may tend to show the guilt or innocence of the accused. But in doing so he should carefully avoid the use of language which may be taken by the jury to intimate an opinion on any fact which it is their duty to decide.

3. SAME: *Same.*
   On the trial of D. and S., jointly indicted for the murder of M., committed by stabbing him, the testimony showed that the wound was inflicted by D. After witnesses had testified that they saw the defendants with knives in their hands a short time before and after the deceased was wounded, a witness was introduced who stated that he saw a difficulty arise between D., and the deceased, which the latter commenced by striking D.; that D., retreated and asked deceased not to cut him; that S., coming into the room about that time, requested them to stop and on their refusal to do so, grabbed at one or both of them; that the defendant D., then fled, the defendant S., and deceased following him; and that as they went through the door he saw a knife in the hands of deceased, but did not see S. with

Sharp v. State.

any.   He also stated that he made no effort to prevent the fighting.   The presiding judge then asked the witness the following question: "Do you mean to   say that you   remained   there and   saw these men fighting with knives and did not interfere in any way to   prevent it ?''   Whereupon the attorney for defendants remarked that the witness had   not   said   that he saw them fight with knives;   and the judge responded: "The jury will be the judge of that.   I am examining the   witness and you can object if you don't think it proper."   *Held:* That as the guilt of S. depended on his participation in the wounding of the deceased, the question and reply of the judge—which the jury may reasonably have taken   to indicate an opinion that he was concerned in the stabbing—tended to deprive him of his constitutional right to have the judgment of the   jury in deciding the   facts of the case,   unaffected by any opinion of the judge.

APPEAL from *Garland* Circuit Court.

J. B. WOOD, Judge.

*G. W. Murphy*, for appellant.

1.   The instructions refused by  the court stated a correct principle of the criminal law.   Wharton Am.  Cr. Law, 4th Rev.  Ed., sec. 568;  57 Ind., 80;  134 Mass., 215;  47 Am. Dec., 265;  36 Ga., 91;  1 Cr. Def., 125-6.

2.   The question and  reply of the judge  was improper.

3.   Reviews  the  evidence and contends that it is not sufficient to support the verdict.   (The  case  was  also argued orally.)

*D. W. Jones*, Attorney General, for appellee.

Argued the case orally.

BATTLE, J.

Appellant  and  Jasper Dunkin  were  jointly indicted for murder in the first degree;  were jointly tried, and were convicted of murder in the  second degree.   They  moved for a new trial.   During the pendency of the motion Dunkin died. The motion was denied and Sharp appealed.

It is alleged  in the  indictment that  the accused murdered

Mike Martin by stabbing him with a knife. The evidence shows that Dunkin stabbed him, and that a physician was called in to treat his wound. Defendants introduced the testimony of experts for the purpose of proving that the wound was not mortal, and that the death of the deceased was caused by the maltreatment of the physician.

As to the responsibility for the death of Martin the court instructed the jury, over the objection of defendants, as follows: "When one willfully and unlawfully inflicts upon another a wound which is not within itself mortal, yet, if by improper treatment of such wound by the physician in charge, it becomes mortal, and the person so wounded dies from such wound and the erroneous treatment of the same by such physician, the person inflicting such wound is criminally responsible for the death." "If you find from the evidence in this case that the defendants inflicted upon Mike Martin a mortal or dangerous wound with a knife, and you also find that said wound was erroneously treated by the physician, and that said Martin died from said wound and such erroneous treatment of the same, you will find the defendants guilty of murder or manslaughter, according as the evidence may show."

Are these instructions erroneous ? Chief Justice Bigelow, after a careful examination of the authorities upon this question in *Com. v. Hackett*, 2 Allen, 141, said: "The well established rule of the common law would seem to be, that if the wound was a dangerous wound, that is, calculated to endanger or destroy life, and death ensued therefrom, it is sufficient proof of the offense of murder or manslaughter; and that the person who inflicted it is responsible, though it may appear that the deceased might have recovered if he had taken proper care of himself, or submitted to a surgical oper

1. HOMICIDE: Cause of death: Maltreatment of wound.

ation, or that unskillful or improper treatment aggravated the wound and contributed to the death, or that death was immediately caused by a surgical operation rendered necessary by the condition of the wound. 1 Russell on Crimes, 7th Amer. Ed., 505; Roscoe's Crim. Ev., 3rd Ed., 703, 706; 3 Greenl. Ev., sec. 139; *Commonwealth v. Green*, 1 Ashm., 289; *Regina v. Haines*, 2 Car. and Kir., 368; *State v. Baker*, 1 Jones Law R., N. C., 267; *Commonwealth v. Mc-Pike*, 3 Cush., 184. The principle on which this rule is founded is one of universal application, and lies at the foundation of all our criminal jurisprudence. It is, that every person is to be held to contemplate and to be responsible for the natural consequences of his own acts. If a person inflicts a wound with a deadly weapon in such a manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality that other causes co-operated in producing the fatal result. Indeed, it may be said that neglect of the wound or its unskillful or improper treatment, which were of themselves consequences of the criminal act, which might naturally follow in any case, must in law be deemed to have been among those which were in contemplation of the guilty party, and for which he is to be held responsible. But however this may be, it is certain that the rule of law, as stated in the authorities above cited, has its foundation in a wise and sound policy. A different doctrine would tend to give immunity to crime, and take away from human life a salutary and essential safeguard. Amid the conflicting theories of medical men, and the uncertainties attendant upon the treatment of bodily ailments and injuries, it would be easy in many cases of homicide to raise a doubt as to the immediate cause of death, and thereby to open a wide door

by which persons guilty of the highest crime might escape conviction and punishment.''

In *Regina v. Holland*, 2 Moody & R., 351, ''it appeared by the evidence that the deceased had been waylaid and assaulted by the prisoner, and that, amongst other wounds, he was severely cut across one of his fingers by an iron instrument. On being brought to the infirmary, the surgeon urged him to submit to the amputation of the finger, telling him, unless it were amputated, he considered that his life would be in great hazard. The deceased refused to allow the finger to be amputated.'' At the end of two weeks lock-jaw followed as the result of the wound, and caused his death. It was held that the prisoner was guilty of murder.

Mr. Greenleaf, in his work on Evidence, says: ''If death ensues from a wound, given in malice, but not in its nature mortal, but which, being neglected or mismanaged, the party died, this will not excuse the prisoner who gave it; but he will be held guilty of the murder, unless he can make it·clearly and certainly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of his death; for if the wound had not been given, the party had not died.''

Mr. Bishop, in his work on Criminal Law, says: ''But, where the wound is not of itself mortal, and the party dies in consequence solely of the improper treatment, not at all of the wound, the result is otherwise. * * But we should not suffer these propositions to carry us too far; because, in law, if the person dies by the action of the wound, and the medical and surgical action, jointly, the wound must clearly be regarded sufficiently a cause of the death. And the wound need not be even the concurrent cause; much less need it be

the next proximate one; for if it is the cause of the cause, no more is required." 2 Bishop on Criminal Law, 7th Ed., sec. 639; *The State v. Morphy*, 33 Iowa, 270; *Kee v. State*, 28 Ark., 155; *Smith v. State*, 50 Ark., 545; *Crum v. State*, 26 Am. Law. Reg., 368.

The instructions were properly given.

The defendants asked and the court refused to give the following, and other instructions to the same effect, to the jury: "The right of self-defence is measured by the necessity, or what appears to be the necessity in the given case, and, therefore, if a person of great physical strength assaults a feeble one, without any manifest or apparent intent to kill him, but with much greater force and violence than he is able to resist by the mere use of his natural members, the person thus assaulted, may, if he has no other reasonable way or means of avoiding or averting the violence and injury, avail himself of any reasonable instrument or means of defence in his possession or within his reach, and, if while defending himself therewith against such assault and injury, and not in a spirit of revenge, ill-will, wantonness or recklessness, or for the purpose of unnecessarily injuring the assailant, he inflicts upon the assailant a wound or stab which is not mortal, but a person called as a surgeon by performing upon it an unwarranted operation renders it mortal, or makes an additional one which is mortal, and death results therefrom, he, the person assaulted, cannot be held criminally liable for the death or homicide."

2. CRIMINAL PROCEDURE: Instructions: Practice on appeal.

The death of Dunkin makes it unnecessary for us to decide the question raised by this instruction. The evidence shows that appellant was present when deceased was stabbed, and prevented Dunkin from stabbing him the second time. He gave no active aid or assistance to Dunkin in the inflic-

tion of the wound.   There  was no positive evidence that he
advised or encouraged it at the time it was done.   The facts
which implicated him, if any, preceeded the conflict in which
the wound was inflicted.   In convicting  him  the jury must
have concluded  that  there  was  an understanding between
Dunkin and  Sharp to  do some  unlawful act, and that Dun-
kin, when proceeding according to the common plan, inflict-
ed  the wound.   Under  this state of  facts the instructions
asked and refused could have been of no service to appellant.

All that is in them which could have been  of  any advan-
tage to him  was  included in  other instructions, which were
given.   For the court expressly told the jury, that they could
not  convict  both  of  the  defendants,  unless  the  evidence
showed that they inflicted upon the  deceased  the  wound of
which he died, or that one inflicted the wound and the other
was present and aided and assisted him therein, or was present
and ready and consented to aid, abet or  assist;  and that, if
they believed from the evidence,  that the wound was not in-
flicted by Sharp,  they must  acquit  him, unless  they found
from the evidence that he  assisted  the  person who inflicted
it· by  acting  in concert  with him, or counselled or advised
him to inflict it.   If Dunkin was  assaulted by the deceased,
and to protect himself, through no spirit of  revenge, ill-will,
wantonness or recklessness,  or  for  the  purpose of unneces-
sarily injuring his assailant, stabbed  him, it  was the duty of
the jury, under these instructions, to  have acquitted the ap-
pellant.

On the trial, one Woods testified, that he saw the difficulty
between Dunkin and the deceased;  that he was talking with
Dunkin,  when  deceased asked Dunkin where his, (deceas-
ed's) wife was, and Dunkin replied he  did  not know.   De-
ceased then said he, Dunkin, was  a  liar, and  commenced

striking at him.   Dunkin retreated  and  deceased  followed.
When they reached a corner of the  room,  in which the diffi-
culty occurred, Dunkin asked the  deceased  not to cut him.
About this  time  Sharp  came  into the room and requested
them  to  stop,  and,  they  refusing to  do so,  he sprang for-
ward and grabbed at them, or one of them, and Dunkin fled,
the deceased and Sharp following; and as they went through
the door, he, witness, saw  a knife in the  hands of  the  de-
ceased,  but  did  not  see Sharp with any.   Other witnesses
had  testified that they  had  seen  Sharp  and Dunkin  with
knives  in their  hands  a short time before and after the de-
ceased was wounded.   Woods further testified  that he made
no effort to  prevent  or  stop  the  fighting.   After  he  had
made this statement, and  while  he  was  testifying, the pre-
siding judge asked him this question:  ''Do you mean to say
that  you  remained  there  and  saw these men fighting with
knives and did not interfere  in  any  way  to  prevent  it ?''
Whereupon  defendant's attorney stated that the witness had
not said that he saw  them  fight with knives; and the judge
responded:  ''The jury will be the judge of that.   I am ex-
amining the witness and you can object  if you don't think·it
proper.''   And the defendants excepted; and appellant now
insists he was prejudiced by this  question,  in the manner in
which it was asked, and by the  remark  made  by the  judge
in  response  to  his  attorneys, and on that account, should
have a new  trial.

*Same:
Examina-
tion of  wit-
nesses.
The judge has the  right, in a  criminal prosecution, to in-
terrogate the witnesses, but he has no right to usurp the place
of  the  State's attorney,  ''and  prescribe the  order of intro-
duction of the witnesses and become active in their examina-
tion;''  nor has he the right to  assume the duties resting on
the prisoner's counsel in the general conduct  of the defence.

He may ask questions which the attorneys had the right to propound and failed to ask, when the answers to the same may tend to prove the guilt or innocence of the accused. It would be a reproach to the laws of the State if he was required to sit and see the guilty escape or the innocent suffer through a failure of parties, or their attorneys, to ask a witness a necessary question. *State v. Ice*, 80 N. C., 483; 1 Wharton Ev., sec. 496.

In all trials the judge should preside with impartiality. In jury trials especially, he ought to be cautious and circumspect in his language and conduct before the jury. He should not express or intimate an opinion as to the credibility of a witness or as to controverted facts. For the jury are the sole judges of fact and the credibility of witnesses; and the constitution expressly prohibits the judge from charging them as to the facts. The manifest object of this prohibition was to give to the parties to the trial the full benefit of the judgment of the jury, as to facts, unbiased and unaffected by the opinion of judges. Any expression or intimation of an opinion by the judge as to questions of fact or the credibility of witnesses necessary for them to decide in order for them to render a verdict would tend to deprive one or more of the parties of the benefits guaranteed by the constitution, and would be a palpable violation of the organic law of the State.

*Remarks of the Judge.*

In *McMinn v. Whelan*, 27 Cal., 300, a witness on crossexamination, was interrogated in respect to her residence and business. Objection was made to this course of examination, the court overruled the objection, at the same time remarking that the witness was a woman of respectability. The appellant insisted that the remark of the judge was an irregularity of sufficient magnitude to authorize the reversal of the judgment of the court below. Mr. Justice Currey, in

delivering the opinion of the court upon this question, said: "From the high and authoritative position of a judge presiding at a trial before a jury, his influence with them is of vast extent, and he has it in his power by words or actions, or both, to materially prejudice the rights and interests of one or the other of the parties. By words or conduct he may on the one hand support the character or testimony of a witness, or on the other may destroy the same, in the estimation of the jury; and thus his personal and official influence is exerted to the unfair advantage of one of the parties, with a corresponding detriment to the cause of the other. We regret the necessity for an expression of our disapproval of the irregularity of which complaint is made, and though we do not impugn the expression as designed to aid the side of the plaintiff, we may say, we should not hesitate to reverse the judgment because of it, if the same depended in any material degree upon the testimony of the witness whose character and standing was thus endorsed."

In *People v. Williams*, 17 Cal., 146, the judge charged the jury that, "the fact that the deceased was a Chinaman gave the defendant no more right to take his life than if he had been a white person; nor did the fact, if you so find, that the defendant was seeking to enforce the collection of taxes against another Chinaman, or even against his victim, give the defendant any right to take his life. Our laws do not sanction the sacrifice of human life in order to enforce the collection of taxes or licenses." In reference to this charge the supreme court said: "The word *victim* in the connection in which it appears, is an unguarded expression, calculated, though doubtless unintentionally, to create prejudice against the accused. It seems to assume that the deceased was wrongfully killed, when the very issue was as to

the character of the killing. We are not disposed to criti-
cise language very closely in order to reverse a judgment of
this sort, but it is apparent that in a case of conflicting
proofs, even an equivocal expression coming from the
judge, may be fatal to the prisoner. When the deceased is
referred to as a 'victim,' the impression is naturally created
that some unlawful power or dominion had been exerted
over his person. And it was nearly equivalent, in effect, to
an expression characterizing the defendant as a criminal.
The court should not, directly or indirectly, assume the guilt
of the accused, nor employ equivocal phrases which may
leave such an impression. The experience of every lawyer
shows the readiness with which a jury frequently catch at
intimations of the court, and the great deference which they
pay to the opinions and suggestions of the presiding judge,
especially in a closely balanced case, when they can thus shift
the responsibility of a decision from themselves to the court.
A word, a look, or a tone may, sometimes, in such cases,
be of great or even controlling influence.''

In *People v. Dick*, 34 Cal., 663, the judgment of the
court below was reversed on account of the use of the fol-
lowing language in the charge to the jury: ''The defendant
is charged with having murdered, in this county, on or
about the 12th day of May, 1866, one S. M. Simpson.
Now, the first question for your decision is this: Was S. M.
Simpson on or about the 14th day of May, 1866, in this
county, murdered? In determining that question, the court
thinks you can have *no hesitation* whatever.'' In respect to
this language, the court said: ''We are of opinion, howev-
er, that the other portion of the charge noted is within the
clause of the constitution which prohibits judges from charg-
ing juries upon matters of fact, and are unable to conceive

of any state of facts under which, in view of that restriction, a judge can be allowed to address such language to a jury. * * Whether wisely or not, the constitution has abrogated the rule of common law by which judges were allowed to express their opinions as to the facts in issue, or as to the weight of evidence. To weigh the evidence and find the facts is, in this State, the exclusive province of the jury, and with the performance of that duty the judge cannot interfere without a palpable violation of the organic law.''

3. SAME.    The conviction of the appellant depended upon his participation in the wounding of the deceased. Upon this point the evidence was weak and unsatisfactory. When the judge said: ''Do you mean to say that you remained there and saw *these* men fighting with knives and did not interfere to prevent it?''—the jury might, reasonably, have inferred that ''these men'' referred to were the defendants, and that the judge was of the opinion they were concerned in the stabbing of the deceased; and when the defendant's attorneys stated that the witness had not said that he saw them fighting with knives, and the judge responded, ''the jury will be the judge of that,'' they might, reasonably, have concluded that the men referred to by the judge in the question asked were the defendants, and that, in his opinion, they fought with knives, as they were selected to decide whether defendants were guilty or innocent of the killing of the deceased. In the midst of doubt as to what their verdict should be as to appellant it was natural for them to seize upon and adopt any opinion which they understood the judge to have expressed or intimated upon the questions which they were required to decide. It is, therefore, evident he did not have a trial according to law—such as was guaranteed to him by the constitution of this State; and, in this respect, was prej-

udiced by the question and reply of the court. In so deciding, we do not mean to impute to the judge an improper motive. On the contrary, we are satisfied that the question was asked, and the reply, was made with no intention to influence the jury or prejudice the defendants.

Judgment reversed and a new trial granted.