Clarence Sidney ALEXANDER *v.* STATE of Arkansas

CR 77-210                                    569 S.W. 2d 106

Opinion delivered July 17, 1978
(In Banc)
[Rehearing denied September 5, 1978.]

12

*William Palma Rainey,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Joseph H. Purvis,* Deputy Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. After midnight on the morning of September 4, 1975, Terry Wyrick, a young filling station employee working at a Fina station near Turrell, was shot twice and robbed. Clarence Sidney Alexander (the appellant) and William Lee Fowler were promptly arrested and presumably charged with aggravated robbery. Upon Wyrick's death 17 days later the two men were separately charged with capital felony murder. Fowler later pleaded guilty and was sentenced to life imprisonment. Alexander pleaded not guilty, was tried by jury, and now appeals from a verdict and judgment finding him guilty and sentencing him to life imprisonment without parole. His appointed counsel argues a number of points for reversal, none of which we find to have merit.

Our statement of the facts is taken in part from Alexander's confession. We therefore hold at the outset that the trial judge's finding that the confession was voluntary is not clearly erroneous. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515 (1974). To the contrary, the preponderance of the proof supports the trial judge's conclusion. The testimony of the officers, to the effect that Alexander was fully warned of his rights and made a voluntary statement, was not contradicted. At the Denno hearing, after the situation had been explained to Alexander, he elected not to testify.

The State's proof of guilt was so persuasive that no question is raised here about the sufficiency of the proof. Alexander's confession was introduced; Fowler testified for the prosecution. According to both of them, they decided to rob

the Fina service station attendant. As planned, Alexander distracted the attention of the victim, Wyrick, while Fowler crept up behind him and hit him on the back of the head with a hammer. When Wyrick fell, his pistol dropped out of his pocket. Alexander picked up the pistol and shot Wyrick in the back of his neck. After Alexander and Fowler had gotten back in their car and driven a short distance, Alexander stopped the car and walked back to the station. There he shot Wyrick again, this time in the face, and took $50 from his pocket. In his confession Alexander said he shot Wyrick the second time because Wyrick grabbed Alexander's wrist and he couldn't get loose.

During Alexander's interrogation he told the officers that he had left the pistol with Albert Mosby, a friend who lived in Memphis. Alexander supplied Mosby's telephone number. When an officer called Mosby, he acknowledged that he had the gun that Alexander had left with him. Alexander then went to Memphis with two officers and showed them where Mosby lived. Mosby turned the gun over to the officers and testified that they treated him with courtesy. There was no search of the premises, nor any violation of Alexander's rights. *Upton* v. *State*, 254 Ark. 664, 497 S.W. 2d 696 (1973). In fact, the main objection made below — that the search was the fruit of the poisonous tree — is rebutted by our holding that the confession was voluntary. Ballistics tests showed that the two bullets taken from Wyrick's body had been fired from the gun in question, which Alexander identified on the Memphis trip as the one that he had used.

We consider next the trial judge's refusal to relieve William Palma Rainey as Alexander's appointed defense counsel. Some six months after Rainey's appointment he formed a law partnership with Kent Rubens. Rubens had represented Fowler for a short time, by appointment, but he was relieved when it appeared that he might be serving in the legislature when Fowler was to be tried. After the partnership was formed Rainey asked that he be relieved as counsel for Alexander, because he needed Rubens's assistance at the trial, and Rubens had learned facts from Fowler that would prevent Rubens from properly representing Alexander.

We find no error in the trial court's refusal to relieve Rainey. The three reasons relied upon in the assertion of error are not sound. First, it is argued that Rubens could not properly cross-examine Fowler, because of the information Rubens had learned from Fowler. That contention overlaps the second one, that Rubens could not argue to the jury, with regard to Alexander's possible punishment, that Fowler was more at fault than Alexander. The record reflects, however, that Rubens *did* cross-examine Fowler, with no indication that he was hampered in doing so. As to the possible punishment, Alexander received the lighter of the only two penalties, death or life imprisonment without parole, that the jury could have imposed. Thus no prejudice is shown. The third argument, that Rubens's knowledge would be imputed to Rainey, is without merit. Under the wording of the partnership statute, the knowledge was not imputable to Rainey, as it was not information that Rubens reasonably should have communicated to Rainey. Ark. Stat. Ann. § 65-112 (Repl. 1966). Moreover, Rubens has stated that he did not reveal the information to Rainey.

Another point for reversal arises from an incident that occurred outside the courtroom before the trial began. Later, after the noon recess, the court considered the incident in chambers. Mrs. Richardson, a juror who had already been accepted, had reported the matter to the court during the noon recess, in the presence of counsel. As the court remembered it, Mrs. Richardson reported that Mrs. Wyrick, the mother of the victim, had identified herself and talked with Mrs. Richardson and two other women who were members of the jury panel. The conversation occurred in the hallway in front of the courtroom, at 9:30. Mrs. Wyrick made the statement that her son was the victim of the crime and that the defendant was the person who shot him. Mrs. Wyrick indicated two places in the face where her son was shot and said that it was cold-blooded murder.

The court conducted an in-chambers hearing, at which both Mrs. Wyrick and Mrs. Richardson testified. According to their testimony, the incident does not appear to have been as serious as Mrs. Richardson reported it. Mrs. Wyrick testified that no one else was present during the conversation,

another woman nearby having walked away as the two began to talk. Mrs. Richardson said that two other women were standing near her when Mrs. Wyrick approached. Mrs. Richardson did not say that the other women heard the conversation, but her testimony does not exclude that possibility. Mrs. Richardson said that she could not recognize the other two women and that she had looked around the courtroom and had not seen them.

Both Mrs. Wyrick and Mrs. Richardson were examined and cross-examined, but neither testified that there had been any reference to cold-blooded murder. Mrs. Wyrick testified that while she was eating lunch at a Tastee Freeze Mrs. Richardson came up to the car to explain that she had reported the incident to the court. During that conversation Mrs. Richardson said that in her opinion, "We ought to kill more of these black sons-of-bitches." (The appellant is black.) That conversation, however, was solely between the two. There is not the slightest indication that Mrs. Richardson's prejudice was expressed to anyone else connected with the case. Mrs. Richardson was, of course, excused as a juror.

The trial judge denied a defense motion either for a mistrial or for an entirely new jury panel. The judge offered to have Mrs. Wyrick and her husband stand up before the jury, to see if any jurors could say that they had talked to either, but defense counsel declined that offer. The judge also suggested that any possibility of harm could be eliminated by counsel, by their asking the jurors if they had talked to anyone in the courthouse about the case. Apparently counsel did not pursue that course. The judge, in denying the motion, noted that the case had been set for trial two or three times, that it had been continued each time at the request of the defense, that the only three available days had been set aside for the trial, that a new jury panel could not be selected in time to use those days, and that another continuance would mean a postponement for several months.

We cannot say that the trial judge was wrong in refusing to grant a mistrial or to discharge the entire jury panel and postpone the trial. In a matter of this kind we must rely primarily upon the discretion of the trial court, reversing his

decision only if an abuse of that discretion clearly appears. Here, except for the reference to cold-blooded murder (which the State's proof showed it to have been), Mrs. Wyrick did not make any statement of fact to Mrs. Richardson that was not brought out at the trial by undisputed evidence. Mrs. Richardson herself was excused from the jury. There remains the possibility that two other members of the jury panel heard what Mrs. Wyrick said. That possibility is suggested only by the trial judge's recollection of what Mrs. Richardson said in her first report to him. It is not borne out by her testimony under oath, nor by that of Mrs. Wyrick. The trial judge had the decisive advantage of seeing and hearing Mrs. Wyrick, and also Mrs. Richardson both when she made her original report and when she repeated it under oath. The trial judge concluded that a mistrial was not required. Under the circumstances no abuse of discretion is shown.

Complaint is made about two remarks by the prosecutor that were belittling to defense counsel. The remarks should not have been made, but they were not so serious as to call for the drastic remedy of a mistrial. *Back* v. *Duncan*, 246 Ark. 494, 438 S.W. 2d 690 (1969). Any possibility of prejudice could have been eliminated by an admonition to the jury, but no such action was requested. In fact, the trial judge did admonish the jury, on his own initiative, after the second remark was made.

There is no merit in the argument that the trial judge should not have asked a witness certain questions to bring out a pertinent fact that had not been elicited by counsel. The questions were proper. *Sharp* v. *State,* 51 Ark. 147, 10 S.W. 228, 14 Am. St. Rep. 27 (1888).

The trial was bifurcated. When the jurors were polled after their verdict of guilty, one juror answered that that was not her verdict. She explained, however, that she was not for electrocution and that her verdict at that stage of the trial was "guilty." Counsel, "for the purposes of the record," asked for a mistrial, but there was obviously no prejudice whatever.

Before the trial the judge denied a defense motion that all the prosecuting attorneys, circuit judges, and circuit clerks

be summoned to testify about the imposition of the death penalty in Arkansas. See *Alexander v. State,* 260 Ark. 785, 545 S.W. 2d 606 (1976). We need not discuss that ruling, because the jury's failure to impose the death penalty makes the proposed testimony immaterial. We have also examined other objections made in the course of the trial and find no asserted error that warrants discussion.

Affirmed.

HICKMAN and HOWARD, JJ., dissent.

GEORGE HOWARD, JR., Justice, dissenting. Among other things, the appellant, who was convicted of capital felony murder and received confinement to the State Department of Correction for life without parole, has pressed for reversal of his conviction, alleging the following:

> 1. The trial court erred by denying appellant's request for either a mistrial or that a new panel of jurors be brought in because of prejudicial remarks being made in the presence of prospective jurors by the mother of the deceased, Terry Wyrick.

The majority, in rejecting this claim as grounds for reversal, has concluded:

> "We cannot say that the trial judge was wrong in refusing to grant a mistrial or to discharge the entire jury panel and postpone the trial. In a matter of this kind we must rely primarily upon the discretion of the trial court, reversing his decision only if an abuse of that discretion clearly appears."

In considering the totality of the circumstances involved in conjunction with the uncontradicted evidence that the mother of the victim made highly prejudicial remarks in the presence of prospective jurors that possibly convicted appellant and sentenced him to the Department of Correction for life without parole, the majority's posture in affirming this conviction is not well founded.

First, the record reflects that prior to the noon recess and

while Mrs. Georgia M. Richardson was being questioned about her qualifications to serve as a juror, she testified as follows:

THE COURT:

"Q. Do you know anything about the case itself, either from what you may have read or heard discussed?

"JUROR RICHARDSON: No, sir.

\* \* \*

"Q. Do you know of any fact, thing or circumstance whatsoever as to why you feel like you could not or should not serve as a juror in the trial of this case?

"JUROR RICHARDSON: No, sir."

Secondly, upon returning from the noon recess, Mrs. Georgia M. Richardson, a juror who had been called from the regular petit jury panel to the jury box, advised the court that she had been contacted by the mother of the victim, but this conversation apparently was not recorded, and thus, what follows below is a summary by the court, while in chambers and in the presence of appellant and counsel for the state and appellant, of what the juror had advised the court:

"THE COURT: At the noon recess at approximately 12:00 o'clock, the jury having been admonished, the jury panel having been admonished, and recessed for lunch until 1:30, a Mrs. Georgia M. Richardson, who had been called from the regular petit jury panel to the jury box, voir dired by the Court, and by the Prosecuting Attorney or prosecution voir dire having been waived as to this juror, and she having been accepted by the State, the juror came to the Court immediately after the recess and indicated that in view of the Court's admonition, she wanted to bring to the attention of the Court that this morning, prior to the court being convened at 9:30, she, along with two other women whom she recognized as being members of the

jury panel, but did not know them by name, were standing in the hallway in front of the courtroom at which time a woman, who she understood was the mother of the victim, Terry Wyrick, made the statement to or in her presence as well as the other two women to the effect that her son was the victim in this crime, that the defendant was the individual or person who shot her son. She, indicating that the mother had pointed to two different places in the face and perhaps other points where her son was allegedly shot, the victim's mother at the time stating at the time that it was cold blooded murder."

* * *

"MR. RAINEY: I might add that she did add that there were two other people that she knew that were prospective members of the panel. She did not state whether or not they were in the box at that time or not though.

"THE COURT: I don't recall whether I actually asked her that or not, but they were not in the box, but on the panel. Perhaps that was an assumption on my part."

Mrs. Flossie Wyrick, mother of the victim, was called in chambers to testify about the incident and the following is relevant parts of her testimony:

BY THE COURT:

"Q. Now, it has come to the attention of the Court from some of the prospective jurors that this morning before the Court convened, in other words, before 9:30, or that some time this morning, at least, you had made certain statements concerning the manner in which your son met his death.

"A. No, I said that he was shot in a robbery.

"Q. In a robbery?

"A. Yes.

"Q. Where were these statements made or how many times did you say it?

"A. One time, right outside the courtroom door when I was standing there talking to a lady. I never seen the lady before, didn't even know her name.

"Q. How many were present at the time; yourself, who else was with you?

"A. Well, no one. . . .

\* \* \*

"Q. You say that you did not know this woman to whom you made this statement?

"A. No.

"Q. Were you talking directly to her?

"A. Well, we were just standing, you know, talking and she said that she had never been in a trial or anything.

"Q. Did she indicate why she was here or how she happened to be here?

"A. Not until after I had talked to her.

"Q. What was said at that time?

"A. She told me that she was here for a jury.

"Q. For jury service?

"A. Yeah.

"Q. Was anyone else present besides her —

"A. . . . No, there was another woman standing there but she had walked — I don't know where she had went

because this woman had been talking to the other woman.

"Q. Now, as nearly as you recall, what did you say?

"A. I told her that I was the mother of the boy that was shot and she asked me where it had happened at and I told her at Turrell. She said that she didn't recall anything about it and I said that it had been almost two years aago, about eighteen or nineteen months ago that it happened.

"Q. Was anything else said that you recall?

"A. Not that I recall.

"Q. Did you make any statements as to how many times he was shot or where he was shot?

"A. I might have; I wouldn't say that I didn't, but I don't know it if I did."

CROSS EXAMINATION BY MR. RUBENS, ATTORNEY FOR APPELLANT:

"Q. Were there other people around when you were talking?

"A. Well, she first went to talking to another lady standing there and she turned and started talking to me and this lady walked off. And then at lunch, we went over to this Tastee Freeze over here to get us a hamburger for lunch and she come up to the car and commenced to talking and I turned my back and I wouldn't listen to her. I hate to repeat some of the things that she said.

* * *

"Q. Okay. Now, what did this Mrs. Richardson tell you at noon? I believe that you don't have to worry; you

will not be in contempt if you use the word. I think that is what is bothering her, Your Honor.

&ast; &ast; &ast;

"A. . . . She says, 'I have told them about talking to you.' She says, 'I am sorry.' I said, 'That's okay.' I understood it. And she said they're going to call it a mistrial. Well, I just kind of turned my head, you know, trying to ignore her and let her go on because I knew I wasn't supposed to be talking to her. And she says, 'My opinion,' she says, 'We ought to kill more of these black sons-of-bitches.' Now, that is just what she said. So I just turned my head and turned my back that way and that was it. And then when my husband came out, I told him what she said. I said, 'I don't even want to talk to her.'

"Q. Now, when you found out from Mrs. Richardson that there was going to be this mistrial, what action did you take?

"A. I didn't say anything."

Mrs. Georgia M. Richardson, the juror who was sitting in the box at the commencement of the noon recess, testified in relevant part, as follows:

BY THE COURT:

"Q. If you would, for the record, will you tell us about the statement you told this woman made earlier to you?

"A. The statement she made to me was that she was his mother and that he had been shot in the chest and the head by this boy here and robbed, killed and robbed by this boy here, and that her son run a service station in Turrell, Arkansas.

"Q. . . . Did she point out any individual or identify any individual?

"A.   Well, he was sitting at the table in the courtroom.

"Q.   In the courtroom?

"A.   Uh-huh.

"Q.   Did she express any opinion as to guilt or innocence or who was guilty?

"A.   No more than she was the mother and her son was nineteen years old, but she did say that it was two years old."

CROSS EXAMINATION BY MR. RUBENS, ATTORNEY FOR APPELLANT:

"Q.   You said now she did tell you that this young man did do it; is that not correct?

"A.   Yes.

"Q.   *All right. Was there anyone else there?*

"A.   *Yes, there was two more ladies there. I don't —*

"Q.   *. . . [W]ere these two ladies white, black?*

"A.   *Yes, they were white.* (Emphasis added)

\* \* \*

"Q.   Did you and those other ladies discuss that after she —

"A.   . . . No.

"Q.   But you all heard it?

"A.   When he said — well, this is how come me to say it. If I had known that I was going to have to go through all of this, I wouldn't have done it anyway.

\* \* \*

"Q. . . . [D]id anybody during a recess or anything, did you talk about this with any of your fellow jurors?

"A. No, I seen the mother at the little drive-in down here and I told her that I was sorry if I caused her any hardship. I told her that at the little drive-in where I went to eat.

"Q. Do you recall her comments to you?

"A. She told me that was all right, that she didn't have no hard feelings."

It is obvious from this record that two other prospective jurors were in the presence of Mrs. Georgia M. Richardson when the victim's mother made the prejudicial remarks. This conclusion is so clear and apparent that even the trial judge, in his summation, concluded that two other prospective jurors were present. Yet, the majority concludes in its opinion:

". . . There remains the possibility that two other members of the jury panel heard what Mrs. Wyrick said. That possibility is suggested only by the trial judge's recollection of what Mrs. Richardson said in her first report to him. It is not borne out by her testimony under oath, nor by that of Mrs. Wyrick."

The majority also relies upon the assumed objectivity of the trial court in the whole matter in affirming appellant's conviction by asserting:

". . . The trial judge had the decisive advantage of seeing and hearing Mrs. Wyrick, and also Mrs. Richardson both when she made her original report and when she repeated it under oath. The trial judge concluded that a mistrial was not required. Under the circumstances no abuse of discretion is shown."

But was the trial judge truly objective in considering appellant's motion for a mistrial? I submit, this record demonstrates clearly that the trial court was committed to trying appellant and was not agreeable to a rescheduling of

the appellant's case. This conclusion is inescapable from the majority's finding in its own opinion as follows:

"The judge, in denying the motion, noted that the case had been set for trial two or three times, that it had been continued each time at the request of the defense, that the only three available days had been set aside for the trial, that a new jury panel could not be selected in time to use those days, and that another continuance would mean a postponement for several months."

It must be remembered that under American Jurisprudence, every defendant, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies, has an unfettered right to an unbiased and unprejudiced jury in the trial of his case. This is an inseparable and inalienable part of the right to a trial by jury guaranteed by the Federal Constitution. *See: Turner* v. *State of Louisiana,* 379 U.S. 466, 85 S. Ct. 546 (1965); *State* v. *Rector,* 164 S.E. 865. Moreover, rationing justice or placing "time" in superior posture to a fair and impartial trial is foreign to American Jurisprudence.

It is clear from this record that when the mother of the victim approached Mrs. Georgia Richardson, the juror who reported the incident, there were two other prospective jurors who were in the presence of Mrs. Richardson at the time, but Mrs. Richardson, nor the victim's mother could identify them for the court. In overruling appellant's motion for mistrial, the court, obviously, assumed, without knowing for sure, that the other prospective jurors who were in the presence of Mrs. Richardson at the time the incident took place, did not serve on the jury that convicted appellant. It must be remembered that Mrs. Richardson stated, after she had advised the court of the communication, that if she had known that such revelation would cause the repercussions created, she would not have mentioned it to the court at all. Thus, it is logical to assume that the other two prospective jurors did not come forth and advise the court of the communication on the part of the victim's mother and remained silent in order to avoid any repercussions or the circumstances that Mrs. Richardson found herself and later expressed regret.

It must be remembered that only these two women could say whether they overheard the conversation between juror Richardson and Mrs. Wyrick. Any testimony as to whether the women heard the conversation, without more information, would be speculative under the circumstances. The record shows that the following women served on the jury that convicted appellant: Jeanette Coley, Ola Jeffers, Ruby Inez Freeman, Brenda Edmonson, Janie Spence, Daisy Russell, Donna Thompson, Bula Needham and Mary Chism.

It cannot be said, from reviewing this record, that there is not a reasonable possibility that the remarks complained of on the part of the mother of the victim might have contributed to appellant's conviction. A fundamental and basic right is involved and the only avenue available to the trial court to be certain that appellant had not been prejudiced was by granting a mistrial. *See: Felton Adams v. State,* 263 Ark. 537.

The majority places great emphasis and reliance in sustaining the trial court by stating that the trial court offered to have Mr. and Mrs. Wyrick, the parents of the victim, stand in the presence of the jury in order to determine if any of the jurors had talked to either. However, defense counsel objected. I submit that defense counsel was correct in objecting to this procedure because it would have simply re-emphasized or compounded the predicament in which appellant found himself and it would have identified the parents to the jury and created sympathy for them at the detriment of appellant.

Finally, it is significant to note that Mrs. Richardson told Mrs. Wyrick that she had been advised that because of the incident, the case would be declared a mistrial. It is clear from this statement that obviously Mrs. Richardson was communicating with someone who was representing the State or led her to believe that the State had concluded that a mistrial should be declared.

I would, therefore, reverse and remand to the trial court for a new trial.